MARÍA MÉNDEZ, por sí y como madre con patria potestad sobre sus menores hijos, ANTONIO e IRIS ROCAFORT MÉNDEZ, demandantes y apelados, *v.* ANTONIO SERRACANTE SANTIAGO, demandado y apelante.

Núm. 7547.—*Sometido:* Junio 22, 1938. *Resuelto:* Noviembre 14, 1938.

*R. Rivera Zayas,* abogado del apelante; *R. Díaz Collazo,* abogado de los apelados.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Esta acción se estableció en reclamación de los daños y perjuicios causados con motivo de la muerte de Antonio Rocafort. La demanda enmendada es muy breve. Sus párrafos esenciales en lo pertinente dicen así:

"4. Que el día 21 de septiembre de 1934, en la ciudad de San Juan . . . el demandado Antonio Serracante dió muerte a Antonio Rocafort, causante de los demandantes, infiriéndole heridas de bala en el abdomen . . . a consecuencia de las cuales falleció el 23 de septiembre de 1934, dejando por sus parientes más próximos y como únicos herederos a la viuda compareciente María Méndez y a sus legítimos hijos Antonio e Iris Rocafort Méndez, menores no emancipados y bajo la patria potestad de su madre la dicha María Méndez.

"........................

"6. Que el demandado . . . al dar muerte del modo anteriormente alegado al causante de los demandantes, privó a éstos de la persona que los sostenía . . . y *así dicho demandado, con esa conducta y actuación ilegal reseñada,* ha causado daños y perjuicios a los demandantes en una cantidad que razonablemente estimada y calculada no es menor de $25,000." (Bastardillas nuestras.)

Interpuso el demandado la excepción previa de insuficiencia de hechos constitutivos de causa de acción. En el mismo escrito contestó la demanda y estableció tres defensas especiales que en síntesis alegan que la muerte de Rocafort fué causada por su culpa y negligencia al asociarse a otras dos personas para agredir al demandado, siendo su muerte el resultado de un accidente desgraciado al hacer presión el propio Rocafort sobre el gatillo de un revólver que tenía en sus manos y que el demandado trataba de quitarle para evitar una agresión con dicha arma. Que en el caso de haber sido el demandado quien disparó, aún así, no es responsable de la muerte porque en tal caso actuó en uso del derecho de legítima defensa.

Contra la sentencia que lo condenó a pagar a los demandantes una indemnización de $5,000 y las costas, estableció este recurso de apelación, en apoyo del cual imputa a la corte sentenciadora la comisión de tres errores, a saber:

1. Al declarar sin lugar la excepción previa de insuficiencia de hechos constitutivos de causa de acción.

2. Al declarar con lugar la demanda, no obstante la ausencia absoluta de prueba creditiva de que sean los demandantes los únicos herederos de Antonio Rocafort; y

3. Al apreciar la prueba.

Consideremos el señalamiento de errores en el orden establecido.

No aparece de los autos ni de la transcripción de evidencia que la excepción previa formulada por el demandado haya sido traída a la atención de la corte. Tampoco aparece que haya recaído resolución alguna respecto a la misma. Sin embargo, se trata de una excepción privilegiada que de prosperar, su resolución hubiera sido incompatible con una sentencia favorable a los demandantes sin antes enmendar la demanda. Por consiguiente, tenemos que asumir que la excepción previa fué implícitamente desestimada por la corte.

Hecha esta aclaración, pasemos a considerar los méritos de la excepción previa.

■ Repetida y constantemente ha venido sosteniendo este Tribunal que en esta jurisdicción la acción de daños y perjuicios por muerte ilegal nace del artículo 1802 del Código Civil (edición de 1930), que es el 1803 de la Compilación de 1911. *Orta* v. *Porto Rico Railway Light & Power Co.*, 36 D.P.R. 743; *Carbou Rodríguez* v. *Mir*, 36 D.P.R. 809; *Cabrera* v. *Boscio*, 38 D.P.R. 314; *Pérez* v. *Sucrs. de M. Pérez & Co.*, 41 D.P.R. 852; *López* v. *Am. R. R. Co. of P. R.*, 50 D.P.R. 1, 8; y finalmente *Ruberté* v. *Am. R. R. Co. of P. R.*, 52 D.P.R. 471, 473.

■■ El artículo 1802 antes citado literalmente dice así:

"Art. 1802. El que por acción u omisión causa daño a otro, *interviniendo culpa o negligencia,* está obligado a reparar el daño." (Bastardillas nuestras.)

No es suficiente, de acuerdo con el transcrito precepto, que se alegue que la muerte fué causada por el demandado u otra persona de cuyos actos él sea responsable. Es indispensable alegar que la causa próxima de la muerte fué la culpa o negligencia de la persona que la motivó. El solo hecho de causar la muerte, valiéndose de un arma de fuego o por cualquier otro medio, no implica culpa o negligencia del demandado, pues pudo ocasionarse aquélla al hacer uso el demandado del derecho de legítima defensa, como se alega en este caso, o al realizar un acto legal con la necesaria prudencia y circunspección.

Comentando el artículo 1902 del Código Civil español, idéntico a nuestro 1802 (edición de 1930), cita Manresa con aprobación la sentencia del Tribunal Supremo de España de 23 de junio de 1900, que resolvió:

". . . que 'la acción para obtener la reparación del daño causado por actos u omisiones en que intervenga culpa o negligencia, requiere necesariamente la demostración de una u otra de dichas causas, porque son el fundamento esencial de la acción citada, según los artículos 1089, 1093, 1902 y 1903 del Código Civil, y por consiguiente, *incumbe dicha prueba al actor* de conformidad con el principio general de la prueba de las obligaciones establecidas en el art. 1214,

*no bastando para dicha justificación la indicación inadmisible de que*
*debe presumirse la responsabilidad por la simple existencia del daño*
*y de que corresponde la exculpación al demandado.'*  En su virtud,
para que con éxito pueda demandarse la reparación preceptuada por
el artículo que examinamos, es indispensable, no sólo la prueba del
daño, sino también la de la culpa o negligencia productora del
mismo.'' (12 Manresa, Código Civil Español, 614.) (Bastardillas
nuestras.)

En la página 615 del citado tomo, repite el mismo autor:

''El mismo Tribunal, en sentencia de 4 de diciembre de 1903, de-
claró nuevamente que 'para estimar procedente en la vía civil la
reclamación de daños y perjuicios ocasionados, no por el incumpli-
miento de una obligación, sino por un hecho u omisión constitutivos
de un delito o cuasidelito, no basta que conste la existencia de aqué-
llos, pues además ha de probarse que provienen de dolo, culpa o
negligencia de la persona a quien se imputen, no existiendo dicha
responsabilidad cuando, en vez de obrar con malicia o culpa el agente,
se circunscribió a ejercitar un legítimo derecho.''

En la página 616, refiriéndose a la sentencia de 23 de di-
ciembre de 1905, dice así:

''. . . para que tenga aplicación el art. 1902 y su consiguiente
el 1903 del Código civil, es *requisito esencial* que intervenga dolo,
culpa o negligencia, en tal forma, que no estimando estas circuns-
tancias el Tribunal sentenciador, sino que por el contrario, declarando
*probada la licitud* de los hechos, que sin embargo dieron origen al
accidente, no surte efectos en casación la cita de los referidos ar-
tículos; sentencia corroborada por la de 30 de mayo de 1906 al
asentar que, para el éxito de la acción derivada del art. 1902, no
basta la ejecución de un acto que *implique* culpa o negligencia, si no
se justifica que por *consecuencia* del mismo han *sobrevenido* daños o
perjuicios a tercera persona.

Finalmente, en la página 617, resume el comentario en la
siguiente forma:

''De las declaraciones hechas en las sentencias que hemos citado
podemos deducir, como conclusión, que para darse origen a la
obligación impuesta por el artículo de que nos ocupamos, es nece-
saria la concurrencia de dos requisitos distintos, a saber: 1º., que exista
un daño o perjuicio no procedente de actos u omisiones propios del

perjudicado, y cuya existencia se acredite debidamente por el que reclama su reparación; y 2º., que dicho daño o perjuicio haya sido causado por culpa o negligencia de una persona distinta de la que lo sufre.''

Argüirán los demandantes que la frase en bastardillas que aparece en el párrafo 6 de la demanda enmendada y que dice: ''y así dicho demandado, con esa conducta y actuación ilegal reseñadas . . . '', constituye la alegación de culpa o negligencia a que venimos refiriéndonos, pero como de la faz de la demanda enmendada no aparece tal reseña, preciso es concluir que tal alegación es una mera conclusión de derecho, desprovista de hechos que la sostengan, por lo cual no puede ser tomada en cuenta al considerar la excepción previa del demandado. *Peñagaricano* v. *Peñagaricano,* 19 D.P.R. 494.

El caso de *Sucesión Peraza* v. *Marín,* 40 D.P.R. 355, no es una autoridad para sostener la suficiencia de la demanda en el presente caso, pues si bien en aquél se alegó en la demanda que ''Marín dió muerte a Peraza deliberada y maliciosamente'' y que las palabras ''deliberada y maliciosamente'' .constituyen una mera alegación de derecho, no es menos cierto que el demandado no impugnó ese defecto de la demanda y por el contrario, mediante estipulación de las partes, se ofreció como prueba de los hechos que motivaron la muerte la transcripción de evidencia en la causa criminal, y conforme dice este Tribunal en el citado caso de *Sucesión Peraza* v. *Marín,* se trataba allí de un caso claro, ''de un crimen perpetrado con ensañamiento y crueldad extraordinarios.''

No habiéndose impugnado en aquel caso la suficiencia de la demanda, y demostrando la evidencia presentada por los demandantes con la anuencia del demandado que se trataba de un asesinato, o lo que es igual, de un crimen sin justificación legal alguna, el defecto de la alegación quedó subsanado por la prueba, que claramente demostraba que la muerte había sido causada por la culpa del demandado.

La demanda enmendada en el presente caso carece de una alegación esencial e indispensable para la existencia de una buena causa de acción. Siendo ello así, incurrió la corte sentenciadora en el primer error que le imputa el demandado apelante al no haber declarado con lugar la excepción previa.

Pasemos ahora al segundo de los errores señalados. Cuidadosamente hemos examinado la transcripción de evidencia y de ella no resulta que los demandantes *sean los únicos herederos* de Antonio Rocafort. Tampoco aparece de la misma si Rocafort murió testado o abintestato, ni existe prueba alguna demostrativa de no haber dejado Rocafort otros descendientes legítimos o naturales reconocidos además de sus dos hijos demandantes.

El artículo 61 del Código de Enjuiciamiento Civil, que aunque no es la fuente original de la causa de acción, como antes decimos, se halla bajo el epígrafe "De las Partes en Acciones Civiles", y que regula el procedimiento en casos como éste en que los demandantes litigan en su calidad de herederos, ha sido interpretado tanto por este tribunal como por los del Continente en el sentido de que cuando los herederos demandan, deben hacerlo uno a nombre de todos o unirse todos como demandantes, y si alguno rehusare asociarse a éstos, deberá aparecer éste como demandado, consignándose el motivo en la demanda, en armonía con el artículo 66 del citado cuerpo legal. Y es que la acción que contempla la ley es una, y una sola también debe ser la sentencia que a favor de los herederos se dicte por el valor total de la vida perdida. Véase a este efecto la monografía en L.R.A. 1916 E, página 170, bajo el epígrafe "Asociación de Beneficiarios." En el caso de *Internatiomal & G.N.R. Co.* v. *Howell,* 105 S. W. 560, resuelto por la Corte Suprema de Tejas en 1907, la acción por muerte ilegal no fué establecida por todos los herederos. Sostuvo la corte que el demandado tenía derecho a que se paralizasen los procedimientos hasta

que todos los herederos fuesen hechos partes en la acción. En el caso de *Hougland* v. *Avery Coal & Min. Co.*, 93 N. E., 40, resuelto por la Corte Suprema de Illinois en 1910, se resolvió que cuando los hijos menores de edad son los únicos sobrevivientes, la acción debe establecerse por o a nombre de todos ellos, puesto que no puede dictarse más de una sentencia por la totalidad de la pérdida. En el mismo sentido se pronunció la Corte de Apelaciones de Nueva York en el caso de *Johnson* v. *Phoenix Bridge Co.*, 90 N. E. 953. En idéntica forma se ha resuelto la cuestión por este tribunal en el caso de *Carbou Rodríguez* v. *Mir*, supra. En dicho caso Carbou Rodríguez, como único heredero de su madre natural Inocencia Rodríguez, estableció una acción de daños y perjuicios por la muerte de aquélla. Apelada por el demandado la sentencia que a favor del demandante dictó la Corte de Distrito de San Juan, se alegó entre otros errores el no haberse probado que el demandante fuera el único heredero de su madre Inocencia Rodríguez. Considerando este error, dijo el tribunal:

"Resta sólo considerar el último de los errores alegados. Sostiene el apelante que no habiendo probado el demandante que fuera heredero único, ni siquiera que fuera heredero de Inocencia Rodríguez, la demanda no pudo ser, como fué, declarada con lugar.

"Hemos examinado la prueba y a nuestro juicio demuestra que el demandante era heredero de Inocencia Rodríguez, pero no demuestra en verdad que fuera el único heredero, aunque todo induce a creer que lo era.

"La ley—artículo 61 del Código de Enjuiciamiento Civil—y la jurisprudencia establecen que la acción debe entablarse por todos los herederos conjuntamente o por uno solo a beneficio de todos.

"En tal virtud nos vemos obligados a *revocar la sentencia apelada* con el solo objeto de determinar si el demandante es o no el único heredero, debiendo la corte inferior dictar nueva sentencia de acuerdo con el resultado de la prueba que se le presente con tal fin, todo sujeto a los principios establecidos en esta opinión." (36 D.P.R. 816, 817.)

Existe también el segundo de los errores señalados por el apelante.

Siguiendo la pauta trazada en el caso últimamente citado, podríamos revocar la sentencia apelada y devolver el caso a la corte inferior para que en bien de la justicia permitiese a los demandantes enmendar de nuevo su demanda, alegando que la muerte fué causada por culpa del demandado, y presentar prueba al efecto de que son ellos los *únicos herederos* de Antonio Rocafort. Pero los tribunales no deben dictar resoluciones inútiles, y manifiestamente inútil sería devolver este caso a la corte inferior para ulteriores procedimientos, si cualquiera que fuere el resultado de los mismos, tuviésemos que desestimar la demanda por resultar de la prueba practicada que la muerte de Rocafort estuvo justificada. Por consiguiente, entremos a considerar el caso en sus méritos, pasando así al tercero y último de los errores señalados, o sea que la corte cometió error manifiesto en la apreciación de la prueba.

■ De la evidencia resulta que Manuel Valencia y Marieta Jordán estuvieron unidos en matrimonio y que con anterioridad al 21 de septiembre de 1934 el vínculo matrimonial fué disuelto por sentencia de divorcio. Que después de la disolución del matrimonio, Marieta Jordán y el demandado Serracante emprendieron relaciones amorosas, lo cual distanció a Serracante de la familia Valencia, de quienes antes era amigo. Que según Manuel Valencia y algunos de sus testigos, el 20 de septiembre de 1934 Marieta Jordán se quejó a Manuel de que Serracante la perseguía y molestaba y a ese efecto imploró su protección, durmiendo en la casa de Valencia la noche del 20 de septiembre, lo cual exasperó a Serracante, quien, valiéndose de una pariente de Marieta, logró en la mañana del 21 sacarla de la casa de la familia Valencia y llevarla a la de la referida pariente en la calle de la Luna, frente a la Catedral. Que en la noche del 21, entre 7 y 8, Serracante se dirigía solo en un automóvil a vi-

sitar a su novia y al pasar frente al. Capitolio fué visto por Manuel Valencia, que en compañía de su hermano Luis y de su íntimo amigo Rocafort, se dirigía según él y su hermano, al Restaurant El Chévere en la parada 22 en Santurce. Que al ver a Serracante, Manuel ordenó a Luis que volviera atrás y lo siguiera, porque tenía necesidad de hablar con él. Así se hizo y en los momentos en que Serracante detenía su automóvil frente al Edificio Catedral, en la calle de la Luna, también junto al de Serracante se detuvo el que conducía a los hermanos Valencia y a Rocafort.

Hasta aquí no hay conflicto en la evidencia. Surge la disparidad al describir las dos partes, demandantes y demandado, los sucesos que tuvieron lugar en la calle de la Luna y que culminaron con la muerte de Antonio Rocafort.

Los hermanos Manuel y Luis Valencia, únicos testigos de los demandantes que declararon acerca de lo sucedido en la calle de la Luna, dicen: Que al detener Serracante su automóvil, y cuando empezaba a bajar, se acercó a él Manuel Valencia, permaneciendo Luis y Rocafort en el automóvil. Que al iniciarse la conversación entre Manuel y Serracante, éste, según Manuel, "hizo ademán de meterse la mano detrás." Según Luis, llegó a sacar un revólver, y en ese preciso momento Manuel le propinó una bofetada a Serracante. Disparó entonces Serracante su revólver sin lograr hacer blanco, parapetándose Manuel detrás del automóvil, viniendo entonces, primero Luis y después Rocafort, quienes agarraron a Serracante para que no hiciera uso del arma. Rocafort lo tenía agarrado por el brazo en cuya mano Serracante portaba el revólver, y Luis lo agarraba por el otro. Mientras tanto Manuel le pegaba con los puños, corriendo poco después a su automóvil para traer una varilla de hierro con la que propinó a Serracante varios golpes en la cabeza, que lo hicieron sangrar profusamente. Forcejeaba indefenso Serracante tratando de desasirse de los que lo agarraban, logrando al fin hacer otro disparo hacia el frente, lo que mo-

tivó que los hermanos Valencia se retiraran, quedándose a corta distancia de Serracante, que continuaba luchando con Rocafort, este último, según los hermanos Valencia, con el único fin de desarmarle y sin intención de hacerle daño. En esta lucha salieron dos disparos más y cuando volvían hacia ellos los hermanos Valencia, se enteraron por Rocafort, que aún continuaba luchando, que había sido malamente herido. En esos momentos llegó la policía, desarmó a Serracante y lo arrestó, siendo conducido Rocafort al hospital, donde falleció tres días después a consecuencia de la herida de bala recibida.

Antonio Serracante declaró que al detener su automóvil frente a la casa número 30 de la Calle de la Luna, mientras bajaba de espaldas porque iba en el asiento delantero, "le brincaron encima" Manuel, Luis y Rocafort, y mientras Rocafort y Luis lo agarraban, Manuel le pegaba con un pedazo de hierro forrado de cuero, algo así como un foete, propinándole cuatro o cinco golpes en la cabeza "que lo dejaron atontado". Que Manuel lo agredía con la varilla de hierro y Luis Valencia con los puños en la cara, y cuando intentaba defenderse de Manuel, cuyos golpes le hacían más daño, Luis y Rocafort lo sujetaban. Que al fin logró desasirse de Luis Valencia, pero entonces Rocafort le agarró los dos brazos y en ese momento Serracante pudo arrebatar el revólver a uno de los agresores, sin poder decir a cuál de ellos, huyendo entonces los Valencia y quedándose él, Serracante, en lucha con Rocafort. Que entonces, en la lucha por la posesión del revólver que Rocafort quería quitarle, salieron tres disparos, habiendo antes salido otro mientras el revólver se hallaba en manos de sus agresores. Entonces volvieron a atacarle de nuevo los Valencia y Rocafort continuaba agarrándolo, y en esa lucha, no sabe cómo, salió herido Rocafort.

El testigo Antonio Villafañe, que a la sazón caminaba por la Calle de la Luna al ocurrir el encuentro, llamado por el demandado declaró: Que iba caminando por la Calle de

la Luna entre 7 y 8 de la noche y que vió pasar un automóvil y otro detrás, de dos asientos. Que de este último bajaron tres individuos, uno de ellos grueso, que luego supo se llamaba Rocafort, quien habló al que estaba dentro del primer carro y lo haló hacia fuera, agarrándolo por los brazos y echándole una llave. Mientras, otro le daba con una varilla de acerco que llevaba y al mismo tiempo el más pequeño de los tres le pegaba con los puños en la cara. El testigo agarró entonces al que tenía la varilla y empezó a forcejear con él. Eran tres contra uno. En eso sonaron los disparos y cree el testigo que salió herido Rocafort, a quien le oyó decir: "No dispare más, que me han herido." Entonces cogieron a Rocafort y se lo llevaron herido.

José Odilio Vega, testigo también del demandado, luego de asegurar a preguntas del abogado de éste que no tenía relaciones de clase alguna con Serracante, declaró: Que en la noche de los sucesos estaba de visita en el balcón de la casa de la que entonces era su novia, hoy su esposa, en la segunda planta de la casa número 32 de la Calle de la Luna, y vió pasar un automóvil en que venía Serracante. Se detuvo éste e inmediatamente detrás, muy rápidamente, dobló "casi en dos ruedas" un carro que lo seguía, y de este último salieron tres individuos hacia donde estaba Serracante y lo increparon y prácticamente lo sacaron del automóvil, aunque no lo arrastraron. Uno lo empujó, cayó en brazos de otro y ahí se entabló la lucha. Uno de ellos usaba un arma, que debió ser contundente, porque asestó varios golpes con ella en la cabeza a Serracante mientras Rocafort lo sujetaba por detrás, atacándolo también el otro hermano. Que en esos momentos, cuando Serracante se hallaba bañado en sangre, una muchacha que estaba en casa de su novia se puso nerviosa y el testigo entró a socorrerla, oyendo entonces varias detonaciones. Al salir nuevamente al balcón se formó un grupo, los hermanos Valencia atacaban de frente a Serracante, mientras Rocafort luchaba por quitarle el arma, hasta que llegó la policía.

Adrede hemos dejado para último término la declaración de la Sra. Carmen Tirado de Herrero, porque según expresó el juez de la corte inferior, le mereció entero crédito y fué en ella que basó las conclusiones que le llevaron a dictar la sentencia apelada.

Declaró la Sra. Tirado de Herrero que vive en Luna 34 y que la noche del suceso se hallaba en su casa. Que entre siete y ocho observó que llegaron dos carros casi simultáneamente. Que del carro que venía detrás salieron tres hombres y antes de que el que estaba en el guía del primer carro se levantara, lo atacaron con algo contundente, pudiendo ella oír el golpe. De ahí, peleando, llegaron al medio de la calle y siguieron peleando, y uno de ellos lo tenía cogido por detrás.

"Seguían golpeándolo. Después salieron unos disparos. A los primeros disparos, corrieron dos y se quedó uno, que después dijeron era Rocafort, todavía agarrado con él, peleando, y volvieron a sonar otros disparos más; entonces la gente allí se aglomeró, lograron separarlos, llegando los dos contendientes al muro de Catedral. Luego llegó la policía."

Más tarde, a repreguntas del abogado de los demandantes, declaró que no vió quién sacó el revólver, pero al refrescarle la memoria con la declaración que horas después de los sucesos había prestado ante el fiscal, admitió que vió a Serracante sacar el revólver. Su declaración como ha sido expuesta concuerda exactamente con la prestada ante el fiscal, con excepción de la persona que sacó el revólver, que en el acto del juicio parecía no recordarlo.

El resto de la prueba practicada se refiere a las relaciones entre Manuel Valencia y Antonio Serracante con Marieta Jordán, sin más pertinencia en este asunto que la de probar el móvil que indujo la desgraciada entrevista de Manuel Valencia con Antonio Serracante.

En la opinión que sirvió de base a la sentencia apelada, el juez de la corte inferior hace una síntesis de las declaraciones de Manuel y Luis Valencia, y de la de Antonio Se-

rracante, la cual concuerda con la que de las mismas hacemos en esta opinión, pero prescinde en absoluto, sin decir por qué, de las declaraciones de Antonio Villafañe y Odilio Vega, y basa su sentencia exclusivamente en la declaración que ya conocemos de la Sra. Tirado de Herrero, expresándose en los siguientes términos:

"Pero siendo éstas las partes interesadas, (se refiere a los hermanos Valencia y Serracante), después de considerar toda la evidencia de una y otra parte, estima la Corte que la Sra. Carmen Tirado Géigel de Herrero, quien presenció los hechos desde el balcón de su casa, y la que nos ha merecido entero crédito, careciendo de interés alguno en el asunto, es la que con más certeza los relata. (Transcribe aquí la declaración de la Sra. Tirado y continúa su razonamiento así:)

"Tenemos entonces que siendo así los hechos, cuando Antonio Serracante hizo los dos primeros disparos, Manuel y Luis Valencia corrieron y quedaron forcejeando Antonio Serracante y Antonio Rocafort, éste para quitarle el revólver a aquél, cuando hubo los otros dos disparos, uno de los cuales hirió en el abdomen a Antonio Rocafort y le produjo la muerte dos días después. El arma fué ocupada por la policía en poder de Antonio Serracante. Antonio Rocafort no tenía arma alguna, no acometió ni agredió a Antonio Serracante; sólo lo agarró por los brazos y forcejeó para quitarle el revólver que portaba, y Antonio Serracante hizo, no obstante, los dos últimos disparos o el disparo fatal, cuando ya los que lo atacaban habían corrido, usando de este modo de más fuerza que la necesaria para repeler la agresión de que había sido objeto por Manuel y Luis Valencia. La muerte de Antonio Rocafort fué injustificada. No se ha demostrado que él se uniera a Manuel y Luis Valencia con el propósito deliberado de acometer y agredir a Antonio Serracante, quien estaba de antemano armado de un revólver, y su intervención no fué la de un agresor o contendiente." (Transcripción de autos, páginas 30, 31.)

Aceptando como aceptamos en su totalidad la declaración de la Sra. Tirado de Herrero, que en lo substancial corrobora las de Serracante, Villafañe y Vega, preciso es concluir que la corte inferior cometió error, no sólo al apreciar la prueba, si que también al aplicar la ley a los hechos probados, que podemos resumir así:

Serracante, que viaja solo en su carro, se detiene frente a la casa donde está su novia. El automóvil que conduce a los Valencia y a Rocafort y que viene siguiéndolo, se detiene junto al primero. Precipitadamente abandonan el automóvil los hermanos Valencia y Rocafort y cuando Serracante salía del suyo, se abalanzan los tres sobre él, agarrándolo Rocafort y agrediéndole los hermanos Valencia, uno con el puño y otro con un "aparato" (según lo denomina la Sra. Tirado de Herrero). Mientras esto sucede, Serracante recibe, sin poderlos evadir siquiera, los golpes que le producen los hermanos Valencia. Rocafort, que es un hombre fuerte y corpulento, continúa haciéndole el favor de mantenerlo indefenso. En medio de esta lucha Serracante logra sacar un revólver y hacer uno o dos disparos que obligan a echarse a un lado a los hermanos Valencia, sin retirarse por completo de la escena donde se desarrollan los sucesos y en aptitud siempre de poder en cualquier momento propicio reanudar sus ataques. Rocafort continúa luchando por desarmar a Serracante, y en esa lucha vamos a conceder que fué Serracante quien tiró del gatillo y produjo los disparos, uno de los cuales causó la muerte de Rocafort.

Ahora bien, la evidencia de una y otra parte demuestra que Serracante no conocía a Rocafort ni siquiera de vista. Pero sí demuestra que Rocafort no se encontró allí accidentalmente, sino que acompañaba a los Valencia en el mismo automóvil en que éstos perseguían a Serracante y que lejos de tratar de disuadirlos de sus propósitos o de retirarse de la empresa, llega con ellos al sitio y su primera actuación, según las declaraciones de la Sra. Tirado, Serracante, Villafañe y Vega, no es interponerse entre las partes para evitar el conflicto, sino que agarra por los brazos a Serracante y lo mantiene completamente indefenso, a merced de sus agresores, de tal manera que de no haber tenido aquél la fortuna de hacer los dos primeros disparos que momentáneamente lo libraron de los Valencia, hubiera sucumbido por los golpes

en el cráneo que le producía Manuel Valencia con la varilla de hierro.

¿No estaba justificado Serracante, dentro de las circunstancias, al quedarse momentáneamente solo luchando con Rocafort, en creer que una vez éste lo desarmase, ya el mismo Rocafort, ora los hermanos Valencia, reanudarían sus ataques en la seguridad de que se hallaban frente a un hombre herido y desarmado? No podemos pretender, como pretende la corte inferior, que el demandado directamente pruebe que Rocafort se había unido a los hermanos Valencia "con el propósito deliberado de acometer y agredir a Serracante." Los propósitos que en aquellos momentos pudieran existir en la mente de Rocafort sólo Dios y él los conocían, pero los hechos, sin duda más elocuentes que las palabras, hubieran inducido a cualquier hombre de moderado valor, en las apremiantes circunstancias en que se hallaba Serracante, a creer que aquel Rocafort a quien ni siquiera conocía antes, era un agresor y que al quedarse en lucha con él por conservar el revólver, luchaba con un enemigo y no con un mero pacificador. No exige la ley que el peligro de perder la vida o recibir grave daño corporal que justifica la muerte en defensa propia sea necesariamente un peligro real. En este caso, asumiendo sin admitirlo que el peligro no fuera real, era por demás aparente. Por consiguiente, no podemos convenir con el juez de la corte inferior cuando dice:

"Y Antonio hizo, no obstante, los dos últimos disparos, o el disparo fatal, cuando ya los que lo atacaban habían corrido, y usando de ese modo de más fuerza que la necesaria para repeler el ataque de que había sido objeto por Manuel y Luis Valencia."

Bien podríamos repetir aquí la sabia frase del Juez Asociado Sr. Córdova Dávila vertida en el caso de *García v. Am. R. R. Co. of P. R.*, 45 D.P.R. 762, 770:

"No debemos esperar de la naturaleza humana más de lo que humanamente puede dar."

Los anteriores razonamientos nos llevan a la conclusión de que Serracante, al privar de la vida a Rocafort, lo hizo en el uso del derecho de legítima defensa, y siendo ello así, en nada se beneficiaría la justicia devolviendo el caso a la corte inferior para ulteriores procedimientos. *Procede, por consiguiente, dictar la sentencia que originalmente debió haber dictado la corte de distrito, o sea, desestimar la demanda con costas a los demandantes, sin incluir honorarios de abogado, por entender que no ha existido temeridad por parte de los demandantes, puesto que con toda probabilidad fueron inducidos a creer que tenían una buena causa de acción por las manifestaciones que indudablemente les hicieron los testigos Luis y Manuel Valencia, quienes acompañaban a su causante en el momento de recibir la herida que más tarde le produjo la muerte.*

El Juez Presidente Señor Del Toro no intervino.