FELIPE CEDEÑO y SILVERIA RODRÍGUEZ, conocida por SILVIA RODRÍGUEZ, demandantes y apelados, *v.* TROPICAL CITY INDUSTRIES, INC., (PUERTO RICO), y GREAT AMERICAN INDEMNITY Co., demandadas y apelantes.

Núm. 10112.—*Sometido:* Mayo 12, 1950.   *Resuelto:* Junio 23, 1950.

*Francis & Ydrach,* abogados de las apelantes; *Ramón G. Goyco*
y *Rafael Hernández Matos,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Al dictar sentencia declarando con lugar la demanda en
este caso la Corte de Distrito de Ponce hizo constar que, de
acuerdo con el crédito que le había merecido lo declarado por
cada testigo y considerando en conjunto el peso o valor probatorio de la evidencia presentada, llegaba a las siguientes
conclusiones de hecho:

"1. Felipe Cedeño y Silveria Rodríguez vivieron en concubinato en el barrio Descalabrado de Santa Isabel, siendo ambos
solteros y mayores de edad, y como consecuencia de esa unión,
nació, en dicho barrio, en 4 de marzo de 1933, el niño Confesor
Cedeño Rodríguez. Después de nacer dicho niño, ambos siguieron residiendo allí y algunos años después se separaron, trasladándose Silveria a Ponce. El niño era aquí atendido y visitado
por su padre y asistió a las escuelas públicas, cursando en
febrero de 1948 el sexto grado elemental.

"2. En las primeras horas de la noche del 8 de febrero de
1948, Milton Leyro Luciano, actuando como chófer de la codemandada Tropical City Industries, Inc. (Puerto Rico) (que
se dedica y se dedicaba entonces a la fabricación, venta y dis-

tribución de hielo artificial en el distrito de Ponce), conducía, manejaba y guiaba en el curso y en ocasión de sus funciones como tal chófer, por la carretera insular núm. 3, Ponce–Guayama, sitio Cuatro Calles de Ponce, el camión Dodge, Licencia H-2565, propiedad de la Tropical City Industries, Inc. (Puerto Rico) y utilizado allí y entonces por ésta para repartir hielo a una velocidad exagerada y excesiva, dando zigzags, sin tocar claxon o bocina, y al pasar por el lado del niño Confesor Cedeño Rodríguez, quien transitaba por esa carretera en dirección contraria, lo hizo en forma tan descuidada y negligente que lanzó dicho vehículo Dodge contra el cuerpo de dicho niño ocasionándole la fractura del craneo y destrucción de su masa encefálica y su muerte instantánea.

"3. Como resultado de dicho accidente los demandantes han sufrido la pérdida de su hijo, la ayuda que a ambos podía prestarles en el futuro, angustias y sufrimientos mentales, daños y perjuicios cuyo valor estima la Corte así: en cuanto a la demandante Silveria Rodríguez, madre en cuyo regazo vivió siempre dicho niño, en la suma de SEIS MIL DÓLARES ($6,000), y en cuanto al padre Felipe Cedeño que aunque no vivió siempre con su hijo, a menudo lo visitaba, lo quería y atendía en la medida en que se lo permitían sus posibilidades económicas, en la suma de TRES MIL DÓLARES, sumas que nadie les ha satisfecho.

"4. En el momento del accidente, el camión que ocasionó dicha muerte estaba asegurado contra accidentes y daños a terceras personas por la codemandada Great American Indemnity Co., hasta la suma de $10,000. (Estipulación de 30 de abril de 1949.)"

No conformes con la sentencia, los demandados interpusieron el presente recurso de apelación y alegan que la corte inferior erró "al no admitir que los demandados presentaran como prueba el resultado de un experimento realizado por el Sr. Francisco Delgado, uno de los oficiales de la Tropical City Industries, Inc., entre ocho y nueve de la noche en el sitio exacto en que ocurrió el accidente y cuyo experimento tenía por objeto probar a la corte inferior que bajo las circunstancias en que ocurrió el accidente era imposible que los testigos de los demandantes que declararon haber identificado el *truck* que mató a Confesor Cedeño como el truck tablilla núm. H–2565 hubieran podido verlo durante un intervalo de

tiempo lo suficientemente prolongado que les hubiera permitido hacer tal identificación. De haberse recibido tal evidencia la corte inferior hubiera tenido que concluir que el testimonio de dichos testigos no era digno de crédito. Denegar la admisión de tal prueba constituyó un claro abuso de discreción." También al conceder a Felipe Cedeño, padre del menor fallecido, la suma de $3,000, ya que habiendo el padre abandonado a su hijo no tenía derecho a recibir compensación alguna por razón de la muerte de su hijo.

El segundo señalamiento carece de méritos. Hubo prueba, creída por la corte, al efecto de que si bien el padre natural del niño no vivía con la madre, sostenía relaciones con su hijo, lo visitaba y semanalmente le daba dinero—dos o tres pesos—para sus gastos. La regla 17(j) de las de Enjuiciamiento Civil[1] no fué infringida. No está de más decir que la causa de acción del demandante no dimana de la Regla 17(j) sino del artículo 1802 del Código Civil, ed. de 1930. *Méndez* v. *Serracante*, 53 D.P.R. 849.

El primer error presenta una cuestión que no ha sido resuelta en esta jurisdicción. Se trata de la admisión como prueba del resultado de un experimento realizado fuera de la corte y no en su presencia. La regla general es que la admisión de tal clase de prueba cae dentro de la sana discreción del tribunal y además, que para que sea admisible

---

[1] La Regla 17(j) dispone lo siguiente:

"*Demanda por Daño o Muerte de un Hijo Menor de Edad.*—Un padre legítimo o natural reconocido, que no hubiere abandonado a su familia, y la madre legítima o natural, solos o conjuntamente podrán entablar demanda por daño causado a un hijo menor de edad, o por la muerte de éste, o un tutor por daño a un menor o pupilo, o muerte de éste, cuando dicho daño o muerte se deba al acto ilegal o negligencia de otro. Dicha demanda podrá entablarse contra la persona causante del daño o muerte, y si dicha persona estuviese empleada por otra persona responsable de su conducta, también contra ésta; Disponiéndose, que la madre legítima o natural será siempre partícipe en la acción, en proporción igual al padre legítimo o natural reconocido; y disponiéndose, además, que nada de lo establecido anteriormente se entenderá en violación de los derechos de herencia establecidos por el Código Civil y de las acciones que son consecuencia de los mismos."

debe demostrarse previamente que el experimento se realizó bajo condiciones substancialmente parecidas o similares al hecho en controversia. Esta regla es aplicable tanto a casos civiles como a casos criminales. 2 Wigmore *on Evidence*, 3ra. ed., sec. 445, pág. 432; Jones *on Evidence*, 4ta. ed., sec. 410, pág. 771; Underhill *on Criminal Evidence*, 4ta. ed., sec. 413, pág. 838; 20 Am. Jur. sec. 755, pág. 627; anotaciones en 8 A.L.R. 18 y 85 A.L.R. 479; *Experimental Evidence*, 34 Ill.L.Rev. 206; *Martin* v. *Ángel City Baseball Ass'n*, 40 P.2d 287 (Cal., 1935); *Amsbary* v. *Grays Harbor Ry. & Light Co.*, 139 Pac. 46 (Wash., 1914).

Antes de que la corte pueda ejercitar su discreción admitiendo o no la prueba del resultado del experimento, debe sin embargo admitir la prueba que se le ofrezca para demostrar que el experimento se realizó bajo circunstancias substancialmente iguales o similares a las que existían en el momento de ocurrir el hecho en controversia. En el caso de *Amsbary* v. *Grays Harbor Ry. & Light Co.*, supra, surgió una situación similar a la del presente y la corte, al revocar la sentencia, dijo:

". . . La corte no tenía todavía que resolver sobre la admisibilidad de evidencia en cuanto al resultado del experimento, y parece claro que el ofrecimiento de prueba en cuanto a la cuestión preliminar de similitud de condiciones era material y relevante a esa cuestión. Somos de opinión que la decisión de la corte fué claramente errónea en tanto incluía prueba sobre la cuestión preliminar de similitud de condiciones. . . ."

Desde luego que las cortes también tienen discreción para determinar si se ha demostrado o no que existe la similitud requerida en estos casos. En el presente, sin embargo, la corte inferior aparentemente creyó que la prueba era completamente inadmisible. Al tratar los demandados de presentar la prueba de que el experimento se había realizado bajo circunstancias similares a aquéllas que prevalecieron la noche del accidente, surgió un largo incidente al final del cual la corte resolvió no admitir la prueba. A nuestro juicio la

actuación de la corte inferior fué errónea y, a no ser porque existen otras circunstancias en el récord que demuestran que el error no fué perjudicial—*Ortiz* v. *Comisión Industrial,* 51 D.P.R. 833; *Quiñones* v. *Galeno,* 53 D.P.R. 361; *Maldonado* v. *Municipio de Ponce,* 39 D.P.R. 247; *Iparraguirre* v. *Nin,* 57 D.P.R. 759—procedería la revocación de la sentencia bajo la regla expuesta en el caso de *Amsbary* v. *Grays Harbor Ry. & Light Co.,* supra, y la cual ha sido constantemente aprobada en otras jurisdicciones según puede verse en los casos y textos antes citados.

Al argumentar el abogado de las apelantes ante la corte inferior, expuso el propósito que perseguía y lo que se proponía probar con la prueba del experimento diciendo:

". . . Entonces, con el señor Delgado vamos a probar a la Corte la distancia que hay de cada una de las entradas de esa barriada Salazar a la entrada de la vía y presentando esto, la Corte llegará a una sola conclusión, *exclusivamente tratar de impugnar la declaración del testigo, ése es el único objeto, del testigo de la parte demandante Julio Rivera Rivera,* a quien la Corte oyó declarar en este Tribunal, y que fué la persona que declaró que estando parado ahí en la entrada de la barriada Salazar vió venir a un *truck* y que ese *truck* pasó tan rápido que el testigo dijo era como así, yo lo hice constar en el récord sonando los dedos, y ese testigo declaró que no solamente vió las tablillas, sino que leyó los nombres. En la caja del *truck* decía Tropical City Ice; que iba una persona. Declaró cómo iba cayendo hacia el suelo el muerto. Yo quiero probarle a la Corte. Yo quiero probarle a la Corte que en un segundo no puede ver todo eso. Declaró entonces que en ese *lapsus* de tiempo, que él dijo que venía a sesenta millas, vió todo eso. Le demostraremos con este testigo que eso es imposible, que es físicamente, humanamente imposible ver todo eso un hombre en ese tiempo. Eso para impugnar la declaración del testigo Julio Rivera." (Bastardillas nuestras.)

Pero es que en cuanto a la identificación del truck de la demandada Tropical City Industries, Inc. no fué el testigo Julio Rivera Rivera el único que declaró. También lo identificó el testigo José A. Rodríguez, quien venía acompañando

al.niño que fué arrollado y muerto en el momento en que ocurrió el accidente.   Lo identificó en ese momento diciendo:

"Lcdo. Goyco:  ¿En ese momento que venían en esa forma, que ocurrió?

"Testigo:  Venía un *truck*.   Venía. . .

"Lcdo. Goyco:  ¿De dónde venía?

"Testigo:  De Santa Isabel a Ponce, 'a to fuete' y no estaba tocando bocina, y al pasar por la vía brincó para arriba, *y le veía una tablillita que decía 'Milton'*.   Venía dando zigzags, y al pasar una curva, cuando quiso dar la curva, pues se desvió y Confesor me haló a mí, y creyendo que se iba a salvar, pero no se pudo salvar y yo caí a la cuneta, y el *truck* le dió con el ala derecha del cajón, y Confesor cayó a la cuneta.   Entonces lo llevaron al hospital y me fuí para mi casa, y la policía, a la media hora la policía fué a casa y fuimos al Frigorífico mi papá y yo."

Y además lo volvió a identificar después del accidente cuando, en compañía de su padre, fué llevado por dos policías precisamente a localizar e identificar el truck y, al efecto, declaró lo siguiente:

"Lcdo. Goyco:  ¿El policía también fué?

"Testigo:  Sí, señor, al Frigorífico.

"Lcdo. Goyco:  ¿Qué pasó cuando llegaron allí?

"Testigo:  Busqué y me dijeron que los *trucks* estaban completos.   Y busqué y no había la tablillita que decía Milton, y fuimos a la Tropical y le preguntaron al 'watchman' si los *trucks* estaban completos, y rebusqué y le dije que faltaba el de Milton, de una tablilla de letra colorada, y le dije que ése era el que faltaba.

".          .          .          .          .          .          .

"Lcdo. Goyco:  ¿No estaba allí el *truck?*

"Testigo:  No, señor.   Entonces, el guardia, que parece que lo conoce. . .

"Lcdo. Goyco:  ¿Dónde fueron?

"Testigo:  A la Loma del Viento.   Entonces no quería salir, porque se creía que mi papá era el papá del que él había matado. Entonces el guardia tocó el truck y estaba caliente, botando humo por el tapón.

"Lcdo. Goyco:  ¿Qué le pasó?

"Testigo:  Que no quería salir.

"Lcdo. Goyco: ¿Cómo era la tablillita?

"Testigo: Con letras 'colorás'.

"Lcdo. Goyco: ¿Qué es esto que yo te presento?

"Testigo: ¡La tablillita!

"Lcdo. Goyco: ¿Dónde estaba esa tablillita?

"Testigo: Al lado derecho del 'bumper' del *truck*.

"Lcdo. Goyco: ¿Estás seguro que era ésta?

"Testigo: Sí, señor.

". . . . . . . .

"Lcdo. Goyco: ¿Cómo pudiste apreciar esta tablilla?

"Testigo: Hay un foco al lado, un cafetín, y a la parte acá hay otro. Cuando brincó en la vía lo vi.

"Lcdo. Goyco: ¿Hay un foco allí?

"Testigo: Sí, señor.

"Lcdo. Goyco: ¿Tú conocías a Milton?

"Testigo: No.

"Lcdo. Goyco: ¿Dices que hay un foco?

"Testigo: Sí, señor.

"Lcdo. Goyco: ¿Y cuando el *truck* dió el brinco en la vía, te diste cuenta de la tablillita?

"Testigo: Sí, señor."

Los dos policías que intervinieron en esta pesquisa corroboraron la declaración de Rodríguez en todos sus extremos. Hay otro detalle interesante en la prueba. Cuando los policías llevaban al chófer Milton Leyro Luciano al cuartel éste les dijo que acababa de llegar de Yauco. Esto no obstante, cuando llegaron a su casa Rodríguez, su padre y los policías, Milton Leyro le hizo una pregunta muy significativa al padre de José A. Rodríguez, Ángel Rodríguez. Veamos. Al llegar a la casa de Milton Leyro dice el testigo que ocurrió lo siguiente:

"Lcdo. Goyco: ¿Dice que llegaron a la casa de Milton?

"Testigo: Sí, señor.

"Lcdo. Goyco: ¿Cuál fué la expresión que hizo Milton?

"Testigo: Preguntó si yo era el papá del muerto.

"Lcdo. Goyco: ¿Y qué usted le contestó?

"Testigo: Me preguntó dos veces, y a las tres le contesté que yo no era el papá."

Si el chófer acababa de llegar de Yauco y estaba en su casa situada en la Loma del Viento de Ponce, sitio distinto a Cuatro Calles donde ocurrió el accidente, ¿cómo sabía el que había ocurrido un accidente y que en el mismo había muerto un niño?

Estamos convencidos de que, independientemente de la declaración del testigo Julio Rivera, que era la que se pretendía impugnar con la prueba del experimento, existe bastante prueba en el récord que identificó tanto al truck como al chófer de la demandada Tropical City Industries, Inc. y habiendo sido creída dicha prueba por la corte inferior, es suficiente para sostener sus conclusiones en cuanto a que fué un vehículo de dicha demandada, guiado por su empleado Milton Leyro, el que ocasionó la muerte del niño.

■ El propósito de la evidencia experimental no es otro que ayudar a la corte a hacer cumplida justicia, determinando la veracidad de cualquier situación de hecho en la forma más exacta posible. Cuando dicha prueba puede afectar la veracidad del testimonio del único testigo del accidente, como sucedió en el caso de *Amsbary* v. *Grays Harbor Ry. & Light Co.*, supra, la no admisión de la prueba preliminar de similitud de circunstancias debe conllevar la revocación de la sentencia como allí sucedió. Empero, en un caso como el de autos la situación es distinta, ya que la prueba del experimento ofrecida para impugnar a un solo testigo no hubiera podido afectar la demás prueba a que nos hemos referido.

*Debe confirmarse la sentencia.*

El Juez Asociado Sr. Snyder no intervino.