Carmen Correa por sí y en representación de la menor Luz Delia Rivera, demandantes y recurridos, *v.* Autoridad de las Fuentes Fluviales de Puerto Rico, demandada y recurrente.

Número 12033.

*Sometido:* 12 de febrero de 1960. *Resuelto:* 29 de junio de 1961.

*Gabriel Guerra-Mondragón* y *Antonio M. Bird,* abogados de la recurrente; *Juan Nevares Santiago,* abogado de las recurridas.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En este caso de daños y perjuicios por la muerte de Feliciano de Jesús se aceptó la negligencia. Quedó en litigio la causa de acción o el derecho de las demandantes Carmen Correa y Luz Delia Rivera a recibir una indemnización. En sus conclusiones de hecho la Sala sentenciadora determinó lo siguiente:

(1) que la demandante Carmen Correa vivió en público concubinato con Feliciano de Jesús en el barrio Sabana de Luquillo por más de 19 años;

(2) que durante todo ese tiempo Carmen Correa era casada con Julio Rodríguez aunque separada de éste;

(3) que Feliciano de Jesús y Carmen Correa eran padres de crianza de la menor Luz Delia Rivera, y ambas demandantes dependían enteramente de Feliciano de Jesús para las necesidades de subsistencia incluyendo medicinas, ropa y alimentos;

(4) que Feliciano de Jesús murió en 8 de julio de 1954 al venir en contacto con un cable desprendido a tierra y conductor de alto voltaje perteneciente a la demandada Autoridad de las Fuentes Fluviales.

Fundándose en el artículo 1802 del Código Civil concluyó la Sala como cuestión de derecho que las demandantes tenían causa de acción para recobrar, y dictó sentencia condenando a la demandada a satisfacerles por concepto de daños, $5,000 a Carmen Correa y $2,000 a la menor Luz Delia Rivera, con costas y $600 de honorarios de abogado.

La concesión de daños como cuestión de derecho es el único error que levanta ante nos la recurrente. Las conclusiones de hecho de la Sala sentenciadora son correctas y

están enteramente sostenidas por la prueba. No obstante, y con miras al derecho a resarcimiento que habremos de sostener, conviene puntualizar algunos hechos de este caso específicos que constan en el récord, dentro del marco de los que concluyó la Sala sentenciadora.

Carmen Correa contrajo matrimonio con Julio Rodríguez Rivera en 15 de junio de 1934. Vivieron como un año juntos. Para el 1937 ya vivía ella con Feliciano de Jesús como marido y mujer bajo un mismo techo, en un caserío público de la "P.R.R.A." en el barrio Sabana de Luquillo. Allí residieron durante muchos años. El concubinato de de Jesús y Carmen Correa fue público, sin interrupción alguna, bajo todas las apariencias de ser marido y mujer, sin que a de Jesús se le conociera mujer otra alguna, y duró hasta la muerte de éste en 1954. Julio Rodríguez Rivera también vivía con otra mujer en quien procreó tres hijos.

Carmen Correa tenía unos 60 años de edad. Feliciano de Jesús falleció a la edad de 42 años, y según determinó el Administrador del Fondo del Seguro del Estado, quien declaró la muerte compensable como un accidente del trabajo, ganaba $3.05 diarios. El Administrador determinó también (la Sala sentenciadora tuvo ante sí prueba directa sobre el extremo), que de Jesús vivió "en público y honesto concubinato" con Carmen Correa por espacio de 19 años, sin que procrearan hijos, no habiendo él contraído nunca matrimonio. Determinó que Carmen Correa y Ana de Jesús, madre del fallecido, dependían de él para sus subsistencias. En la extensión en que el Administrador halló esa dependencia, dividió proporcionalmente la compensación en un 80% para Carmen Correa y 20% para la madre. Los gastos de entierro fueron con cargo a la compensación de ambas. El Administrador del Fondo demandó a la Autoridad subrogado en los derechos de Ana de Jesús, y el pleito se transigió.

La niña Luz Delia Rivera era hija natural de la hija menor de Carmen Correa, o sea, su nieta. Se desconocía

quién era el padre y desde la edad de tres meses fue tomada por su abuela a instancias del propio de Jesús quien quiso tener a la niña consigo y desde entonces ellos la criaban como si fueran sus padres en el hogar que tenían constituido. La niña los llamaba "papá" y "mamá" y se declaró en el juicio, celebrado en 9 de abril de 1956, que tenía tres años de edad. Tendría aproximadamente un año tres meses de edad al fallecimiento de de Jesús, y había estado más o menos un año en su compañía.

La cuestión a resolver gira en torno a la obligación de la demandada de indemnizar a las demandantes por la muerte de de Jesús que se debió a la negligencia de aquélla. Son aplicables los artículos 1042, 1046 y 1802 del Código Civil (ed. 1930), 31 L.P.R.A. secs. 2992, 2996, 5141. [1]

Dispone el 1802 según aplicable a este caso que: "El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." Desde la primera vez,—*González v. San Juan L. & T. Co.* (1911), 17 D.P.R. 124, una acción de la madre por la muerte de un hijo menor,—hemos sostenido siempre que la causa de acción sustantiva para reclamar daños por la muerte de otro por culpa o negligencia es el anterior artículo 1802. [2]

En cuanto al problema básico de quiénes pueden ejercitar tal causa de acción bajo el precepto general del 1802 en ausencia de otras disposiciones de ley expresa, y que se nos presenta en la doctrina como un problema siempre abierto

[1] Artículo 1042: "Las obligaciones nacen de la ley, de los contratos y cuasi contratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia".

Artículo 1046: "Las que se deriven de actos u omisiones en que intervenga culpa o negligencia no penadas por la ley, quedarán sometidas a las disposiciones del capítulo II del título XVI de este libro." (Artículos 1802 al 1810.)

[2] Dos casos previos de muerte,—*Pérez v. The American Railroad Company of Porto Rico* (1905), 9 D.P.R. 218, una acción de un padre por la muerte de un hijo natural; y *Marrero v. López* (1909), 15 D.P.R. 766, muerte de un hijo del demandante por un mayordomo en donde se invocó la responsabilidad del artículo 1803,—no discutieron el problema. Y véase: *Zalduondo v. Sánchez* (1909), 15 D.P.R. 231.

a discusión en el que hay encontrados criterios en la juris-
prudencia, y de autores y comentaristas, hasta donde se nos
han presentado casos nuestro derecho tiene asumida ya una
posición bastante clara y definida que sigue aquellas moda-
lidades más liberales y a la vez más justicieras de la doc-
trina. (³)

(³) En tanto el precepto subsista así de general, "el que por . . . causa
daño *a otro*", el problema señalado no cesará de debatirse mientras no sea
posible fijar lindes a las relaciones humanas. Puig Brutau nos apunta
un comentario de F. H. Lawson, muy pertinente por cierto, en cuanto a
que el derecho romanizado en el aspecto que ahora nos concierne se carac-
teriza por la sencillez de sus principios y de su vocabulario, mientras que
el inglés, pobre por sus principios pero rico por su detalle. Y dice Puig
Brutau:

"Del art. 1.382 del Código civil francés ha dicho F. H. Lawson que
*reads like a manifiesto*, parece una proclamación de principio. Así sucede
también con el correspondiente artículo 1.902 de nuestro Código civil: 'el
que por acción u omisión cause daño a otro interviniendo culpa o negligencia
está obligado a reparar el daño causado'. No se trata, como sabemos, de
una regla estricta, pues no atribuye una consecuencia precisamente deta-
llada a un supuesto que también se halle previsto con detalle, sino que
se limita a señalar un punto de partida para el razonamiento que habrá
de decidir si un caso determinado queda dentro del ámbito normativo del
precepto. Ante un artículo como el transcrito, entendemos que la misión
del juez no puede consistir en la *simple averiguación* de si un hecho está
incluido en la previsión de la ley, pues en tal caso su ineludible misión
consiste en *resolver si debe quedar incluido. La obra del jurista es aquí
marcadamente creadora porque ha de resolver qué interés debe gozar de
protección jurídica en lugar de poderse limitar a la comprobación de cuál
está ya reconocido como tal.*

No desvirtúa lo que acabamos de afirmar el hecho de que el artículo
expresado muchas veces se aplique de manera indudable en situaciones
determinadas. Cuando se trata de una formulación tan general, la exac-
titud y precisión en el resultado es consecuencia del criterio tradicional
con que *se incluyen* unos hechos y *se excluyen* otros en el supuesto de
aplicación del precepto. Cabría afirmar que la línea que separa los hechos
incluidos de los que se excluyen no puede trazarla quien sólo lea las palabras
del artículo, sino que depende del hecho de admitir los precedentes que
lo han interpretado y de los nuevos hechos que permitan justificar una
variación de criterio. Basta examinar las sentencias que, en esta materia,
se han dictado durante los últimos años en diversos países para que se
pueda apreciar la siguiente verdad: *rige de manera primordial la casuística
en todas partes*" . . . Y sigue:

"Es preciso tener en cuenta que el carácter general o particular de
las reglas de Derecho no sólo depende de su propia formulación, sino del
carácter novatorio o reiterado de los hechos que han de quedar jurídica-
mente regulados. Sucede muchas veces que, con una alteración de las

Desde el caso de *González*, supra, de 1911, y hasta que se nos presentó en 1938 el de *Ruberté v. American Railroad Co.*, 52 D.P.R. 471, ([4]) los casos que vinieron a nuestra consideración fueron de padres por la muerte de hijos y de éstos por la muerte de aquéllos, en que aun cuando se invocaran daños por derecho propio, concurría la condición de ser la parte demandante un heredero o presunto heredero. ([5])

En el caso de *Arreche*, supra, dijimos que los artículos 60 y 61 del Enjuiciamiento Civil concretaban, en cuanto a los casos fijados en los mismos, la regla general del 1802 del

circunstancias, la regla que parecía ser una clave precisa para resolver un conflicto de intereses se convierte en un simple punto de partida del razonamiento judicial. Los conflictos de intereses que se presentan al evolucionar las condiciones de la vida social han de ser atendidos con normas adecuadas, aunque lo más frecuente es que la adecuación se consiga de manera lenta pero incesante, como un resultado de la interpretación constructiva. Precisamente esta necesidad de que una regla general deje el paso a otras reglas más concretas que se ajusten al cuerpo de los nuevos hechos, representa una fuerza que tiende a desmoronar todo sistema cerrado de normas en un complejo de criterios empíricos que, a su vez, exigirá una reexposición en forma de normas generales, a manera de un renovado punto de partida para la casuística". (Énfasis suplido). *Fundamentos de Derecho Civil*, Tomo II (1956) págs. 659–665.

([4]) Pasando por *Díaz v. P. R. Railway, Light & Power Co.* (1914), 21 D.P.R. 78; *Rivera v. Reyes* (1923), 31 D.P.R. 440; *Arreche et al. v. P. R. Ry., L. & P. Co.* (1923), 31 D.P.R. 445; *Maldonado v. Hamilton* (1923), 32 D.P.R. 224; *Orta v. P. R. Railway, L. & P. Co.* (1927), 36 D.P.R. 743; *Carbou Rodríguez v. Mir* (1927), 36 D.P.R. 809; *Sucn. Peraza v. Marín* (1929), 40 D.P.R. 355; *Izquierdo v. Andrade* (1933), 44 D.P.R. 727; *Dávila v. P. R. Ry., Light & P. Co.* (1933), 44 D.P.R. 950; *López v. American Railroad Co. of P. R.* (1936), 50 D.P.R. 1; y *Parrilla v. Loíza Sugar Co.* (1937), 52 D.P.R. 241, con excepción del caso de *Porto Rico Ry., L. & P. Co. v. Corte* (1928), 38 D.P.R. 340 en que la acción se inició por el propio lesionado y al fallecer sostuvimos que pasaba a sus herederos; y del caso de *Pérez v. Sucrs. de M. Pérez y Co.* (1931), 41 D.P.R. 852 en que le negamos la acción a un administrador judicial, habiendo herederos.

([5]) Con posterioridad al caso de *Ruberté*, igual situación se nos presentó en *Méndez v. Serracante*, 53 D.P.R. 849; *Rivera v. Olabarrieta* (1941), 58 D.P.R. 432; *Soto v. Luchetti* (1941), 58 D.P.R. 713; *Asencio v. Am. Railroad Co.* (1946), 66 D.P.R. 227; *Rojas v. Maldonado* (1948), 68 D.P.R. 818; *Vargas v. Alers* (1948), 69 D.P.R. 231; *Cedeño v. Tropical City Industries* (1950), 71 D.P.R. 626; *Díaz v. Autoridad Fuentes Fluviales* (1950), 71 D.P.R. 931; y *Fournier v. Fournier* (1955), 78 D. P.R. 430.

Código Civil. En esa ocasión negamos a una madre el derecho a reclamar basado directamente en este artículo, en adición a la acción que ejercía el padre demandante bajo el artículo 60.

*Ruberté* v. *American Railroad Co.* nos presentó por vez primera una causa de acción por muerte *iure sanguinis*. El demandante no tenía la condición de heredero de la víctima (existían hijos legítimos), pero sí la de pariente: era su padre. Considerando el artículo 143 del Código Civil—31 L.P.R.A. sec. 562—en cuanto al deber recíproco de ascendientes y descendientes de darse alimentos, dijimos: "El hecho fue que Justo Ruberté no sólo tenía el deber de alimentar a su padre sino que *en verdad contribuía a su sostenimiento*". Habiéndose establecido la negligencia de la demandada, surgió en su consecuencia una causa de acción a favor de Pablo Ruberté por la muerte de su hijo", citándose el artículo 1802. (Énfasis adicionado.)

No mucho después, en *Rodríguez* v. *Ell Tee, Inc.* (1941), 57 D.P.R. 948, tuvimos ante nos otra acción de la misma naturaleza, en el caso de una hermana que reclamó por derecho propio por la muerte de otra, alegando que ella era el pariente más cercano y había sufrido daños "por los sufrimientos y pérdida del cariño y afecto de su hermana y por la ayuda material que de la misma recibía" . . . Sostuvimos esta vez que la prueba no demostraba que la demandante dependiese de la interfecta para su subsistencia, aunque más adelante expusimos que aún en el supuesto de que dependiera de ella para su sostenimiento, no tenía derecho a indemnización por no concurrir las circunstancias enumeradas en el artículo 143.([6]) Aceptando el hecho que en ausencia de ascendientes y descendientes legítimos o legitimados heredaban los colaterales, expresamos que ello no implicaba que cada

---

([6]) Según el inciso (5) de este artículo la obligación de alimentos entre hermanos existe cuando por un defecto físico o moral, o por cualquier otra causa que no sea imputable al alimentista, no puede éste procurarse su subsistencia.

pariente colateral pudiera establecer una acción separada en reclamación de daños [doctrina ésta que seguimos también en los casos de herederos forzosos en que exigíamos bien que el demandante alegara ser el único heredero, o bien que los uniera a todos], y que además de no haber alegado la deman- dante ser la única heredera de su hermana, tampoco había alegado que la víctima no dejara testamento válido, requisito éste para que fuera llamada a la herencia la sucesión intes- tada y entre ella, los colaterales. Permitimos que la deman- dante enmendara su demanda. Y véase: *Acosta* v. *Crespo* (1949), 70 D.P.R. 239, en donde ante la alegación de que una hermana no había alegado ni probado una causa de acción a su favor, dijimos: [pág. 258] "alegó ella y declaró que era la única heredera de su hermano. Declaró que de- pendía de su hermano para su subsistencia. Estos hechos eran suficientes para darle a ella el derecho a demandar por su muerte ilegal. *Rodríguez* v. *Ell Tee, Inc.*, 57 D.P.R. 948; artículo 143, Código Civil, ed. de 1930. ([7])

Hasta aquí habíamos sostenido acciones de daños por muerte que aunque se ejercitaran por propio derecho,—no como un patrimonio hereditario,—concurría en ellas la con- dición de la parte demandante de ser un heredero o presunto heredero, con excepción del caso de *Ruberté* en que sin serlo, la acción se vinculó a la obligación de alimentarse entre ascendientes y descendientes del artículo 143, considerándose también el hecho de que *en verdad*, aquel hijo contribuía al sostenimiento del padre demandante.

Tal era el estado de nuestra jurisprudencia cuando se resolvió el caso de *Travieso* v. *Del Toro y Travieso* (1953), 74 D.P.R. 1009, en donde una hija natural reconocida inter- puso acción por la muerte de su padre. El padre legítimo de la víctima intervino y reclamó como heredero forzoso. Se

---

([7]) Citamos el artículo 143, aunque nada se dijo de la situación que exige el inciso (5) para alimentos entre hermanos. Tuvimos que darle peso al factor de que se había probado una alimentación y subsistencia de la hermana como cuestión de hechos y de realidad.

·desestimó por la Sala de instancia la intervención porque el padre no tenía derecho hereditario alguno en la sucesión testada existiendo una hija natural reconocida. En cuanto a este extremo sostuvimos al tribunal sentenciador. Pero, reafirmando una vez más que la fuente original de daños por la muerte de una persona es el artículo 1802, dijimos que no era necesario para el reclamante ser técnicamente un heredero, siendo suficiente con que él fuera padre de la víctima y que sufriera daños en virtud de su condición y relación de padre, considerando la destrucción de su derecho real o potencial a alimentos *y la paralización permanente de los beneficios prospectivos que él podía haber recibido de su hijo.* Aclaramos un concepto que hasta ese entonces se había estado debatiendo en un área un tanto indefinida, cual es, que ya fuera bajo el artículo 61 del Enjuiciamiento Civil que hemos mencionado, o ya bajo el artículo 1802 del Código Civil, la causa de acción por muerte no es patrimonio hereditario de la víctima, y no se trasmite en virtud de las normas que rigen la sucesión hereditaria. Esta cuestión ha sido objeto de mucho debate y de encontrados criterios en la doctrina, pero incuestionablemente, adoptamos el sentir prevaleciente, y por lo menos hasta este momento no hay razón alguna o fundamento de peso para que no continúe siendo un criterio permanente en nuestro derecho. Resolvimos que el padre interventor podía demandar bajo el artículo 1802 no obstante la acción de la hija ya que la relación de padre e hijo es tal que con la muerte perdía aquél su derecho a alimentos consagrado por el artículo 143 y *aún si el padre no recibía alimentos en forma real y efectiva,* él perdía los *beneficios* prospectivos y potenciales inherentes a esa relación. Sin embargo, no paramos ahí. Aparte del factor económico dijimos que el juzgador debía considerar factores de afecto y de cariño al aquilatar los daños, incluyendo sufrimientos mentales causados al padre.

En *Vázquez* v. *Pueblo* (1954), 76 D.P.R. 594, sostuvimos el derecho de unos hermanos a recibir compensación por la

muerte de otro hermano, en circunstancias en que, distinto en parte a la situación del caso anterior, no se alegaba ni había envuelto daño material ni económico, y sólo por los sufrimientos y angustias mentales y *pérdida de la compañía y sociedad del finado*.   Sostuvimos que los términos amplios y generales del artículo 1802 no permitían establecer diferencia entre los daños físicos y los daños morales exclusivamente, y si éstos son consecuencia de la culpa o negligencia, son recobrables por sí mismos.   Siguiendo la doctrina de estos últimos casos, en *Hernández* v. *Fournier* (1957), 80 D.P.R. 93, no aceptamos que la demanda de unos padres por la muerte de su hija quien a la vez tenía una hija legítima, y quienes alegaron que vivía en su hogar compartiendo con ellos su cariño y afecto y proporcionándoles ayuda espiritual, material y económica, así como el haber sufrido angustias mentales por su muerte y por la privación de su compañía y del afecto y cariño de su hija, dejara de aducir dicha demanda una causa de acción por no alegar que ellos eran los únicos herederos o las únicas personas que dependían de la víctima. [8]

En la dirección en que ha venido evolucionando nuestro derecho, dando pleno sentido al precepto sencillo y claro del artículo 1802, que tal como lo clasifica Puig Peña "es un amplio *tipo en blanco* [énfasis del autor] que preside todo el disciplinamiento de las responsabilidades extracontractuales *que la ley abstrae de las múltiples facetas de la vida real*" [9] (énfasis adicionado) ; y que como apunta Castán en torno a la culpa *aquiliana*, representa un daño sin relación jurídica precedente "salvo el deber genérico, común a todos los hom-

[8] En el caso de *Vázquez*, ya al terminar la opinión señalamos hacia el problema de la identidad de los que pueden obtener indemnización por sufrimientos morales exclusivamente;—si el derecho se extendía a aquéllos que, aunque no relacionados con el difunto, demostraran la realidad del daño sufrido y de sus sufrimientos y angustias.—Nos pareció innecesario entrar en dicho problema ya que allí se trataba de hermanos del finado que estaban colocados en una categoría obviamente permisible. Igual situación era la de este caso de *Fournier*, en que se trataba de los padres.

[9] Tratado de Derecho Civil (1951) Tomo IV, Vol. 11, pág. 571.

bres, de no dañar a otro (alterum non laedere)";([10]) y que "todo daño, material o moral, siempre que sea real y demostrado, da lugar a reparación";([11]) habremos ahora de afrontar una situación en la que no están presentes ninguno de los vínculos de derecho en que tradicionalmente se ha debatido el asunto, ni el de cónyuge, ni el consanguíneo o de parentesco concurra o no en el mismo la condición de heredero, ni tampoco el vínculo de ley alimentario, aunque sí uno de hecho en que la demandante y el interfecto, a quien no se le conocía ningún otro hogar ni mujer otra alguna, vivieron por no menos de 19 años y hasta la muerte de aquél maritalmente bajo el mismo techo, *more uxorio*, en una comunidad de vida tanto en el orden material y económico como en el orden afectivo. En su amplia discusión sobre quiénes pueden exigir la indemnización, Colombo,([12]) a la luz del artículo 1079 del Código Civil argentino, sustancialmente igual en cuanto al concepto del daño a otro, sostiene la acción por el directa o indirectamente agraviado "aunque ningún vínculo familiar lo ligue a la víctima principal del acontecimiento. Sería el caso, sin más, de la concubina que pierde a su compañero en un choque de tranvías y no tiene medios para sostenerse ella y los hijos habidos durante la unión irregular." Cree Colombo, al igual que Salvat,([13]) que el derecho de los hermanos a pedir indemnización "debe serles reconocido siempre que ellos acrediten un perjuicio propio y directo" . . . y que "lo mismo debe decirse de la concubina, que si no se halla unida a su compañero más que por lazos afectivos o de conveniencia y no es su heredera obligada—excepto en algunos supuestos de aberraciones sexuales indudables—, no se alcanza 'a comprender el motivo decisivo para excluirla de los términos generales y absolutos' de la citada regla". (art. 1079) argentino, 1802

---

([10]) Derecho Civil Español, Común y Foral (1955), Tomo I, Vol. II, pág. 489.

([11]) Idem, (1956), Tomo IV, pág. 822.

([12]) Culpa Aquiliana (cuasi delictos), pág. 708 et seq.

([13]) Colombo se refiere a "Hechos Ilícitos" del Dr. Raymundo M. Salvat.

nuestro). ˙ Más adelante observa: "Si una persona *que no se halla unida* [énfasis del autor] a la víctima por ningún lazo de parentesco, sufre un perjuicio por la muerte de ella a raíz de un acto delictual o cuasidelictual, ya hemos dicho (. . . .) que puede reclamar la correspondiente indemnización . . . Quiere esto decir, pues, que el resarcimiento admitido por el Código es, de acuerdo con elementos principales de justicia y equidad, el más completo posible . . . Poco importa, por eso, que el damnificado sea o no pariente en grado sucesible o heredero forzoso del muerto. Desde el momento que logre demostrar el daño recibido, no hay motivo para negarle la indemnización. ¿Que ello puede extender demasiado, como teme Machado,* la lista de los demandantes? No vemos el peligro ni lo verá quien examine la cuestión sin apasionamientos ni ideas preconcebidas. El tercero acciona porque la desaparición de uno de sus congéneres le ha causado una lesión. Si esta lesión está debidamente probada, tendrá para él la misma importancia que un atentado directo contra su persona o sus bienes. ¿Por qué, entonces, impedirle la obtención de las respectivas compensaciones?" Más particularmente en cuanto a la concubina, admite Colombo que es cierto se halla en una situación al margen de la moral y de la ley, pero mientras no trate de prevalerse de las relaciones ilegítimamente mantenidas "nada impide que, si sufre un perjuicio real derivado de la muerte de su compañero, tramite y obtenga el resarcimiento respectivo". Su situación es igual a la de un tercero que sufre daño. ([14])

(*) José O. Machado. Exposición y comentarios del Código Civil Argentino.

([14]) Si bien no siempre tratan el caso específico de la concubina, véanse, en cuanto a la extensión general del 1802: Borrell y Soler, Derecho Civil Español (1955), Vol. III, pág. 606, "¿Quién puede reclamar la indemnización por culpa extra-contractual?"; Borrel Macia, Responsabilidades Derivadas de Culpa Extracontractual Civil (1958), pág. 327, "Quien Puede Reclamar Indemnización Por Daños y Perjuicios". Giorgi, Teoría de las Obligaciones (1929), Vol. V, "De la acción en resarcimiento del daño. Quien Puede Ejercitarla," pág. 293; estudios de Alberto Montel sobre Problemas de la Responsabilidad y del Daño con notas del derecho español por J. Roca Juan (1955), Capítulos I al VII.

Aparte de la exposición de los diversos criterios de autores y tratadistas más exigentes unos y menos conservadores otros, sobre el problema de quiénes pueden reclamar bajo precepto de contenido tan general y a la vez de lenguaje tan preciso como lo es el artículo 1802 nuestro y son sus equivalentes en los códigos latinos, se han mencionado en estos estudios dos sentencias que establecieron una pauta negatoria de la acción de la concubina, basadas ambas en un mismo supuesto de derecho. En la jurisprudencia italiana, la sentencia del Supremo Collegio de 24 de marzo de 1938 que cita Montel, op. cit. pág. 73, y que según la comenta, responde al supuesto en la doctrina de ese país de que debe existir un derecho entre la víctima y el reclamante que quede lesionado por el acto culposo, y que de reconocerse en tal situación un criterio menos riguroso tendría la consecuencia de establecer en materia de daños derivados de muerte una interpretación del artículo 1151 del Código italiano enteramente diversa de la que constantemente le era dada a dicha norma con referencia a cualquier otro campo.

La segunda es la de la Corte de Casación francesa de 27 de julio de 1937. Dalloz *Jurisprudence Générale* 1938. En Francia se había reconocido acción a la concubina y como observan los Profesores Mazeaud, [15] la Corte de Casación distinguía según la estabilidad del concubinato y admitía que si contaba con bastante duración, debía suponer que no se habría roto, concluyéndose que la concubina alegaba en ese caso un perjuicio no hipotético, sino cierto; y que aplicando por primera vez como supuesto de derecho la necesidad "de un interés legítimo jurídicamente protegido" afirmó esta vez la Corte de Casación que una concubina no hacía valer tal interés, negándole acción. No obstante tal doctrina que exigía un interés legítimo jurídicamente protegido y un derecho lesionado, el cual no existía en la reclamación de una

---

[15] Lecciones de Derecho Civil (1960), Parte II, Vol. II, págs. 361, et seq.

concubina por ausencia de obligación alimentaria civil, comentan estos autores que la regla general no se ha mantenido y que hoy ya no se exigía el vínculo de la obligación alimentaria, habiéndose reconocido el principio de la reparación del perjuicio causado a un hermano por la muerte de otro cuando no existía obligación alimentaria civil entre ellos. ([16])

Ante la evolución de nuestra propia jurisprudencia, a la vez que por el pensamiento más lógico de aquellas autoridades que sitúan bajo el principio proclamado en el artículo 1802 a todo aquel *"otro"* que sufra perjuicio y lo demuestre, ante la modalidad del problema que ahora se nos presenta no estamos inclinados a establecer como un supuesto general de derecho, —con absoluta abstracción de los hechos y circunstancias envueltos en cada caso,—un criterio limitativo y excluidor en cuanto a quiénes pueden reclamar dentro del ámbito jurídico de dicho artículo. Definitivamente habíamos descartado ya el supuesto del *ius hereditatis* en los casos de muerte culposa inmediata. Como regla de general vigencia con abstracción de todo otro hecho, el ámbito de dicho artículo 1802

---

([16]) Los Mazeaud señalan la preocupación en la jurisprudencia francesa con lo que llaman "daño de rebote" y el número de acciones que podrían surgir, y exponen que la Corte de Casación se ha esforzado por luchar contra la multiplicación de las acciones y ha sido llevada así a limitar la posibilidad de intentar una acción de responsabilidad civil. Con ello explican las limitaciones que la jurisprudencia francesa ha introducido al precepto general del 1382 del Código francés, que según dicen en principio no exige ningún requisito particular para ser demandante sino ser víctima, restringiendo el círculo de las personas que pueden formular una acción de responsabilidad. Hasta cierto punto hemos desechado esa preocupación cuando dijimos en el caso de *Travieso* que podría ser indeseable e injusto el permitir una multiplicidad de reclamaciones contra una persona en virtud de un solo acto torticero, pero de un lado, tal resultado está permitido por el artículo 1802 que debemos observar y acatar, y de otro lado, no debe haber daño sin remedio; y por lo que dijimos en el de *Vázquez*, que el hecho de permitir que compensación por daños morales exclusivamente puede abrir las puertas a reclamaciones fraudulentas, ficticias o simuladas, no debe constituir un argumento que implique la inobservancia de los términos amplios y generales del artículo 1802, y que las cortes no deben negar reparación por daños realmente sufridos simplemente para evitar que haya un aumento de pleitos; las reclamaciones fraudulentas se dan en todas las ramas del derecho y es el deber de las cortes distinguir las legítimas de las falsas.

tampoco debe quedar restringido al *ius sanguinis* o a aquellos casos en que se lesione un derecho previamente protegido entre la víctima y el demandante, como judicialmente lo ha restringido la jurisprudencia francesa con miras a evitar la proliferación de pleitos; fundamento éste, que en una evaluación de consecuencias no le hemos dado tan decisivo peso, según apuntamos en el escolio (16) ante.

Hay que recurrir a la casuística de que nos habla Puig Brutau al principio, que de manera primordial rige en todas partes, y como él apunta, realizar la labor creadora que determine qué interés debe gozar de la protección jurídica, y qué se excluye y qué se incluye ante los hechos nuevos; y buscar, como expone Puig Peña, "las responsabilidades extracontractuales que la ley abstrae de las *múltiples facetas de la vida real.*"

Por supuesto, esa casuística debe estar presidida por un sano juicio y por criterios razonables y ponderados en la evaluación de cada caso, de modo que de un principio de derecho bueno y justiciero no haya de hacerse una distorsión de la imagen de la ley. Ante los hechos y circunstancias del caso ahora ante nos,—entre ellos una mujer de unos 60 años con la limitación natural que la edad le creaba para ganar el sustento y afrontar las demás necesidades materiales que la víctima, de 42 años al morir, le proveía desde hacía muchos años; que perdió esa protección material, y en el orden afectivo la compañía y sociedad del finado por largos años unido a ella,—será sostenida la compensación por daños que la Sala sentenciadora concedió a Carmen Correa.([17]) Como dice Díaz Pairó,([18]) "[D] año en general será la diferencia entre

([17]) La Sala sentenciadora no expresó el concepto de los daños concedidos. Aunque sería desnaturalizar la realidad de los hechos creer o asumir, por la sola razón de ser la concubina, que ella no sufrió daños morales en el orden afectivo, toda vez que se ha demostrado que tuvo daños materiales y no habremos de alterar la cuantía concedida, no es necesario, aparte de que no se plantea cuestión alguna sobre este particular, distinguir aquí ahora entre uno y otro concepto de daño.

([18]) Teoría General de las Obligaciones (1954), Vol. II, pág. 61.

la situación de la víctima antes de sufrir el acto ilícito y la que tiene después."

Arguye la recurrida como fundamento para que no se sostenga la compensación otorgada, que la causa de acción de Carmen Correa "emana" de relaciones ilícitas sostenidas por ella en abierta violación de las leyes penales que castigan el adulterio. Su causa de acción emana del artículo 1802 por un acto en que intervino culpa o negligencia y causó daños. Quizás lo que la recurrida quiere más bien sostener es que por la ilicitud de sus relaciones con la víctima, los tribunales no debemos repararle el daño causado. ([19]) Si como cuestión de régimen de derecho ella tiene base para reclamar si prueba la existencia de daño, en el orden jurídico prevaleciente menos convencional pero más humano en cuanto a las relaciones en general extramatrimoniales, no habremos de negarnos a reparar el daño sólo por estas consideraciones. Nuestra misión en estos momentos no es la de reformar costumbres de la convivencia social tan antiguas como el derecho mismo que rige a la comunidad. En una esfera relacionada, la de la subsistencia bajo nuestros estatutos de accidentes del trabajo, a la concubina se le reconoce el derecho a compensación aunque

---

([19]) Hay tratadistas franceses que piensan así. Los Mazeaud aprueban el cambio que dio la Corte de Casación en la sentencia de 27 de julio de 1937, arguyendo que todo concubinato es inmoral e ilícito, contrario a las reglas legales de la constitución de la familia—op. cit. pág. 362.—Aunque les "causa sorpresa no encontrar en el Código civil una prohibición formal del concubinato", admiten la existencia de legislación que asimila las concubinas a la viuda en cuanto a pensiones de guerra, y la que permite conservar la pensión a la viuda del funcionario que viva en concubinato, aunque sus derechos se encuentren disminuidos. *Lecciones de Derecho Civil, Parte I, Vol, III,* "El Matrimonio y la Unión Libre", págs. 51-55. Planiol dice que la jurisprudencia admite la acción no solo cuando la ayuda se debía a una obligación legal, sino también cuando se proporcionaba voluntariamente y en virtud de una simple obligación moral, pero que ha demostrado alguna indecisión cuando el socorro le parece *poco moral*, y que por eso los tribunales en algunas ocasiones han concedido a la concubina reparación de los recursos que le proporcionaba el concubino, y en otras se la han negado para impedirle que obtenga un provecho de su inmoralidad. Tratado Elemental de Derecho Civil, (1945) 12a. ed. Vol. VI, pág. 536.

concurra la viuda, como cuestión de política pública en este tipo de remedio. Por otra parte están las leyes filiales aprobadas a partir de 1942 que aunque en otros conceptos, como cuestión de política pública no se repudia la relación extramatrimonial. Y este Tribunal, siguiendo criterios sociales avanzados, ha reconocido en sus decisiones cierto régimen económico que en ocasiones se asemeja a la sociedad legal de gananciales, entre personas que viven maritalmente, en protección de los intereses patrimoniales de la concubina.

■■ Considerando los hechos y circunstancias de este caso, no se sostendrá la indemnización concedida por separado a la niña Luz Delia Rivera. Los daños, aun los morales, han de tenerse y sufrirse por quien los reclama. En su corta edad esta niña había estado dependiendo del occiso por breve tiempo, y luego quedó bajo el amparo de su abuela a quien se ha compensado materialmente. Y ella era demasiado pequeñita para reconocerle sufrimientos y angustias mentales.

*Se modifica la sentencia recurrida eliminando la compensación de $2,000 concedida a la menor y, así modificada, se confirmará.*