Martínez Torres, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Confirmamos una sentencia por la suma total de $100,000 de indemnización por los daños producidos como consecuencia de la grave negligencia de una enfermera del hospital demandado, quien al intentar cortar un esparadrapo, le amputó a sangre fría el dedo pulgar de la mano derecha a un bebé de mes y medio de nacido.
I
Como señaló el Tribunal de Primera Instancia en la primera página de su sentencia, este caso de la vida real "supera, en desgracia, todas las historias que autores creativos puedan imaginarse." Sentencia,' pág. 1, Apéndice Escrito de Apelación, pág. 6. Los hechos de este caso no están en controversia y el hospital demandado aceptó su negligencia. Este cuestiona únicamente las cantidades concedidas como indemnización y el hecho de que el tribunal de instancia alegadamente compensó al infante co-demandante por angustias mentales. Repasemos los hechos que dieron lugar a la indemnización por daños y perjuicios.
Los co-demandantes Edwin Feliciano Pérez y Elizabeth Ruiz Santiago concibieron al niño Bryan Feliciano Ruiz en excelente estado de salud. El 23 de marzo de 1996, cuando Bryan tenía mes y medio de nacido fue llevado a la Sala de Emergencia del Hospital Perea en Mayaguez porque tenía fiebre alta. Su pediatra ordenó su hospitalización. En el hospital, la madre pernoctaba con el infante en una habitación semiprivada.
Dos noches después, la madre llamó a una enfermera porque la línea del suero inyectado en la mano derecha del bebé tenía problemas. Una enfermera acudió al cuarto y al utilizar unas tijeras para cortar el esparadrapo que aguantaba la línea del suero, le cortó el dedo pulgar derecho al bebé, a sangre fría. El dedo le cayó a la madre en su falda.
Según la determinación de hechos del foro de instancia que se encuentra incontrovertida, "el niño empezó a gritar y a sangrar profusamente....". Sent., pág. 2, Ap. Apel., pág. 7. La madre, "a quien le cayó el pedazo del dedo en su falda estaba histérica, desesperada, confundida porque no entendía lo que había pasado." Id. El personal del hospital se llevó al niño para atención urgente. Además, se llevó en un vaso con hielo el pedazo de dedo amputado. "No es necesario abundar en explicaciones del tremendo dolor, desesperación, angustia de la madre y del niño durante tal episodio." Id.
La angustia de la madre no terminó ahí, por supuesto. Esta trató de llamar a su esposo, el co-demandante Feliciano Pérez, para que fuera a acompañarla. Sin embargo, el personal del hospital la sacó del cuarto y no se lo permitió, ejerciendo lo que con corrección, el tribunal apelado llamó "una absurda inflexibilidad....". Id. La Sra. Ruiz Santiago tuvo que deambular por el hospital en busca de un teléfono. El teléfono público, ubicado en otro piso, estaba dañado, y ella tuvo que llamar a sus familiares desde el teléfono de una oficina del hospital en otro piso. La Sra. Ruiz Santiago estaba tan *1101 histérica que no pudo explicar lo sucedido; tuvo que hacerlo otra persona.
Los familiares y el esposo de la Sra. Ruiz Santiago llegaron al hospital. Se reunieron en el cuarto de Bryan. Cuál sería su asombro cuando varias veces empleados del hospital entraron al cuarto a buscar el dedo cercenado. Se creó mayor confusión, dolor y angustia en los padres quienes buscaron en todo el cuarto, incluyendo en los zafacones, tratando infructuosamente de localizar el pedazo de dedo que deseaban reemplantar. Sent., pág. 3, Ap. Apel., pág. 8.
Afortunadamente el dedo siempre estuvo en el vaso con hielo en el que los empleados del Hospital Perea lo pusieron. Veinte minutos después, el Dr. Víctor Ortiz Justiniano, cirujano pediátrico, reimplantó el dedo en su lugar. El bebé fue dado de alta tres días después, con instrucciones precisas sobre el procedimiento de curetaje y cambio de vendajes.
El Tribunal de Primera Instancia dio total credibilidad al perito de la parte demandante-apelada, el Dr. Natalio Debs. Este es un cirujano plástico con subespecialidad en cirujía de mano. El Dr. Debs coincidió con el perito del hospital demandado-apelante, el cirujano Ortiz Justiniano, en que la operación fue un éxito. Ello no obstante, el Dr. Debs aclaró que eso no significa que la funcionalidad y apariencia del dedo haya sido correjida en su totalidad. El dedo refleja la cicatriz y deformidad producto de la amputación. Además, por tratarse del dedo pulgar, se afectarán las habilidades motoras finas del niño con la mano derecha. El perito aclaró, sin embargo, que todavía es muy temprano, dada la corta edad del niño, para determinar cuál será su limitación funcional definitiva. No surge de la sentencia apelada que el perito del hospital afirmara otra cosa.
Por su parte, la co-demandante-coapelada Ruiz Santiago tuvo que ser referida a un psicólogo. Ella confrontaba un gran número de problemas emocionales relacionados con el incidente en el hospital. Se consideraba responsable en alguna medida de lo sucedido a su hijo, pues pensaba que pudo haberlo evitado. Además, sentía temor de lastimar al bebé al cargarlo o tocarlo. Su psicólogo clínico, el Dr. Carlos Ramírez Cancel, "relató el enorme sufrimiento, dolor y las reacciones emotivas que sobrecojían a la madre cada vez que intentaban discutir el recuerdo del momento de la amputación." Sent., pág. 4, Ap. Apel., pág. 9. La Sra. Ruiz Santiago estuvo en psicoterapia hasta octubre de 1996. Tuvo que dejar su trabajo por veinte semanas para cuidar al bebé. De éstas, sólo dos le fueron pagadas (a razón de $187.48 por semana, neto) por caer dentro del período de licencia por maternidad. Su psicólogo testificó que al presente, la Sra. Ruiz Santiago está mucho más tranquila, aunque todavía angustiada. Id.
Ante esa prueba, y aceptada la negligencia del Hospital Perea, el Tribunal de Primera Instancia encontró responsable a esa parte y le condenó a indemnizar $50,000 al menor Bryan Feliciano Ruiz, $30,000 a Elizabeth Ruiz Santiago y $20,000 al Sr. Edwin Feliciano Pérez, todo ello por "sufrimientos y angustias mentales". El Hospital Perea alega que no procede compensar al menor por ese concepto y que las cantidades concedidas a sus padres no están sustentadas por la prueba. Los demandantes-apelados han presentado su alegato de réplica por lo que el recurso de apelación está listo para ser decidido.
II
El hospital apelante señala que el Tribunal Supremo de Puerto Rico ha resuelto repetidamente que un infante no puede ser compensado por sufrimientos y angustias mentales. En efecto, el Tribunal Supremo ha señalado que un infante no puede sufrir daños mentales dentro del significado jurídico. Véanse, Riley v. Rodríguez de Pacheco, 119 D.P.R. 762, 804 (1987); Correa v. Autoridad Fuentes Fluviales, 83 D.P.R. 144, 160 (1961). Esa norma es comprensible. Un infante no tiene la capacidad de angustiarse por las consecuencias del daño sufrido. Su única preocupación es el presente: comer, dormir, no sentir dolor. Como afirma el hospital apelante, un bebé no puede "discernir ni analizar las futuras implicaciones y consecuencias de hechos que le sucedan....". Escrito de Apelación, pág. 4.
No obstante, eso no significa que el menor sea incapaz de sentir dolor o que ese dolor no sea compensable. Quizás consciente de esa importante diferencia, el hospital apelante admite que los bebés "[pjosiblemente pueden sentir dolor...", pero señala que lo que sufrió el bebé Bryan sólo puede catalogarse como una "pena pasajera". Sin citar autoridad médica alguna que le respalde, el hospital cuestiona si el bebé sufrió un'dolor intenso, pues "[a] esa corta edad todavía el sistema nervioso que *1102 capta los hechos en la periferia del cuerpo y los lleva al cerebro donde se registra el dolor, no está totalmente desarrollado y no sabemos cuanto [sic] dolor pudo haber sentido este bebé y claro está el [sic] no nos lo puede decir." Id., pág. 3. Desconocemos la fuente de la cual el hospital apelante obtuvo esa impresión. Un estudio de la literatura médica más reciente nos lleva a concluir lo contrario.
La medicina tiene un historial deficiente en lo que se refiere al tratamiento del dolor en los niños. Por ejemplo, un estudio de diez textos principales de pediatría realizado en 1993 (N.I. Shechter, C.B. Berde & M. Yaster, Pain in Infants, Children and Adolescents, demostró que de las 12,000 páginas sólo se dedicaba menos de una al manejo del dolor en los niños. P. Phillips, Neonatal Pain Management: A Call to Action, 21 Pediatric Nursing 195, 195 (1995). Hasta la década de los setenta, la profesión médica aceptaba sin cuestionar la idea equivocada de que los bebés no sienten dolor. Por esa razón, a los infantes que eran sometidos a cirujía mayor no se les suministraba anestesia, sino drogas para inmovilizarlos por un rato. El Dr. Charles Berde es co-fundador y director del servicio de tratamiento del dolor en el Hospital de Niños de la Escuela de Medicina de la Universidad de Harvard. Está reconocido como una de las máximas autoridades en ese campo. El Dr. Berde explica porqué antes se pensaba que podía operarse a un bebe sin anestesia: "The reluctance to use anesthesia was not due to doctors being mean and nasty.... There were real risks. It was an era when some babies did die from anesthesia, especially the ones who were very sick. So if you didn't know how to anesthetize them safely, it was easier to believe they didn’t feel pain." D. Grady, A Child's Pain, Time Special Issue 12, 14 (Fall 1997).
Pero los bebés sí sienten dolor. De hecho, la medicina moderna condena como falacias las aseveraciones que hace el Hospital Perea en su escrito ante nos. Como se asevera enfáticamente en el Capítulo 62 del principal texto de pediatría, Behrman, Kliegman & Arvin, Nelson Textbook of Pediatrics 287 (15th ed. 1993):

"The inability of the pediatric patient... to communicate a painful experience clearly has led to the accumulation of complex societal beliefs and medical misjudgments that have resulted in the undertreatment of their pain. Some misconceptions about pain in children include (1) children have a higher tolerance to pain, (2) pain perception in children is decreased because of biological immaturity, (3) children have little or no memory of a painful experience, (4) children are more sensitive to the side effects of analgesics, and (5) children are at special risk for addiction to narcotics. There is no evidence to substantiate these beliefs."

Contrario a lo que asevera el hospital apelante, la falta de madurez neurológica de un bebé no le hace incapaz de sentir o recordar el dolor. La razón para ello es sencilla: Estudios anatómicos demuestran que el dolor se transmite por medio de conectores, del nervio estimulado al cordón espinal. De ahí pasa al tálamo, donde el cerebro percibe el dolor. Todos esos conectores están totalmente formados y en funcionamiento para el tercer trimestre de gestación del feto. Behrman, Kliegman & Arvin, id.
Más aún, al evaluarse neonatos que fueron sometidos a operaciones sin anestesia (como por ejemplo, circuncisiones), se observó un patron de respuestas anatómicas al dolor, tales como alza en la presión arterial, pulso acelerado, aumento en la resistencia vascular en los pulmones, alza en la presión intracraneal, sudor en las palmas de las manos y un descenso en la presión parcial trascutánea de oxígeno. También ocurren reacciones hormonales y endocrinólogas. Por ejemplo, el organismo libera corticosteroides, pero suprime la liberación de insulina. Behrman, Kliegman & Arvin, id. Todas estas reacciones demuestran que el infante percibe el dolor. El dolor desata una cascada de hormonas de estrés que pueden debilitar el sistema inmunológico del neonato y afectar su comportamiento futuro. D. Grady, supra. La respuesta del neonato es exagerada dada la inmadurez de su sistema nervioso. Pero no hay duda que el dolor produce cambios en el comportamiento que varían en cada neonato. Esos síntomas persisten luego que cesa el dolor, lo que sugiere también que el infante recuerda la sensación dolorosa. Behrman, Kliegman & Arvin, supra. Los estudios demuestran que a los seis meses de edad, los infantes evitan consistentemente los estímulos que en el pasado les causaron dolor. P. Phillips, supra. Eso también sugiere que el infante recuerda la experiencia dolorosa sufrida en los primeros días de su vida.
Ante estos factores, entendemos que si bien no procede compensar al infante Bryan por angustias *1103 mentales, sí procede compensarle por el dolor que sufrió cuando le fue amputado su dedo a sangre fría. Un hospital responde por el dolor físico causado por la negligencia de sus empleados. Véase, Cabrera v. Asoc. de Señoras Damas, 96 D.P.R. 775 (1968). No estamos hablando de una pena pasajera ni de una preocupación, sino de un dolor físico producto de una actuación negligente que acarrea consecuencias que perdurarán durante toda la vida del menor. Véase, Moa v. E.L.A., 100 D.P.R. 573, 587 (1972). Una lectura integral de la sentencia apelada nos convence de que fue eso lo que el Tribunal de Primera Instancia compensó como "sufrimientos y angustias mentales". Como la apelación se da contra la sentencia y no contra sus fundamentos, no nos parece que el uso de esta frase amerite la revocación de la sentencia dictada en este caso. Pagán Navedo v. Rivera Sierra, Opinión de 30 de mayo de 1997, 97 J.T.S. 76, pág. 1085; Rodríguez v. Serra, 90 D.P.R. 776, 777 (1964). Rechazamos entrar en un juego de palabras en el que la compensación por el dolor físico sufrido se ve anulada por la "etiqueta" equivocada que utilizó el foro de instancia para describir el daño a ser compensado. Después de todo, ¿es que acaso se piensa que cuando se le amputó su dedo, Bryan lloró por otra cosa que no fuera por el inmenso dolor que sentía?
Por otro lado, como señalara el Tribunal Supremo en Riley v. Rodríguez de Pacheco, supra, pág. 805:

"La apreciación humana valorativa de elementos que no son ostensibles y visibles sino intangibles (emociones tales como dolor, alegría, tristeza, frustración, paz, tranquilidad del espíritu, honor y otras) no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta."

En tan difícil tarea de adjudicar la compensación por daños, "los tribunales de instancia, de ordinario, están en mejor posición que los tribunales apelativos para evaluar la situación, por cuanto son los que tienen contacto directo con la prueba que a esos efectos presenta la parte que los reclama." Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 451 (1985). Es por eso que la parte que solicita la modificación de las sumas concedidas a nivel de instancia "viene obligada a demostrar la existencia de las circunstancias que hacen meritorio el que se modifiquen las mismas." Toro Aponte v. Alvarez, Opinión de 31 de enero de 1996, 97 J.T.S. 18, pág. 629.
Ante la magnitud del daño y sus consecuencias, tales como la pérdida de algunas funciones motoras, según la prueba pericial presentada, no nos parece exagerada la cuantía de $50,000 concedida como indemnización al infante Bryan Feliciano Ruiz. Tampoco nos parece exagerada la compensación de $30,000 a la madre y $20,000 al padre de Bryan. Ambos sufrieron la amargura de ver que a su bebé se le cercenó un dedo por la negligencia de una enfermera del hospital demandado-apelante. La madre sufrió además la injuria de ver el dedo de su hijo caer en su falda, y demostró sufrir todavía reacciones emocionales asociadas con el incidente. Esta tuvo también que dejar de trabajar, lo que privó a la familia de un ingreso por varios meses. Ante esa realidad incontrovertida, y la magnitud de los daños, no parece que el Hospital Perea haya salido muy mal parado al tener que satisfacer tan sólo una indemnización total de $100,000.
De todos modos, el hospital apelante no sometió un relato de la prueba oral desfilada en instancia. Con ello nos impide poder aquilatar su planteamiento de que la indemnización concedida no se ajusta a la prueba presentada. Regla 54.2(g) de Procedimiento Civil, según enmendada; Benitez Guzmán v. García Merced, 126 D.P.R. 302, 308 (1990); Acosta Vargas v. Tió, 87 D.P.R. 262, 264 (196); Matos v. Gándara, 69 D.P.R. 22 (1948). Procede entonces que apliquemos la presunción de corrección que acompaña a la sentencia apelada. Cortés Piñeiro v. Sucn. A. Cortés, 83 D.P.R. 685, 690 (1961).
III
Así pues, a base de todo lo antes expuesto, se confirma la sentencia apelada.
Lo acordó el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General