Pesante Martínez, Jueza Ponente
*757 TEXTO COMPLETO DE LA SENTENCIA
Comparece la parte demandada, Kmart Corporation, en el interés de obtener la revocación de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao, mediante la cual se declaró con lugar la demanda en daños y peijuicios presentada por Marisel Anaya Vega, Pedro Cruz Rodríguez, la sociedad legal de gananciales compuesta por ambos y Santa Vega Valentín.
Se modifica la sentencia apelada a los fines de eliminar las partidas asignadas a Pedro Cruz Rodríguez, la de la sociedad legal de gananciales y honorarios de abogado. Así, también, se reduce la compensación de Marisel Anaya Vega a $10,000.00 y la de Santa Vega Valentín a $5,000.00. Así modificada, se confirma la sentencia apelada.
I
Los demandantes Marisel Anaya Vega, su esposo Pedro Cruz Rodríguez, la sociedad legal de gananciales compuesta por ambos y Santa Vega Valentín, presentaron una reclamación por daños y peijuicios contra CT Corporation System. Alegaron que cuando la codemandante Marisel Anaya Vega (Marisel) salía de hacer sus compras en Kmart, en compañía de sus dos hijos y su madre Santa Vega Valentín (Santa), fue intervenida por dos empleados para que regresara a Kmart por alegadamente haber hurtado dos lámparas. Pero, luego le permitieron irse con toda la mercancía.
Los demandantes enmendaron su demanda e incluyeron a Kmart Corporation, apelantes en este caso. Kmart contestó la demanda negando todas las alegaciones, y como defensa afirmativa planteó que la demanda no aducía hechos constitutivos de una causa de acción. También, que los hechos que daban acción a la reclamación de Marisel, habían sido causados por ella misma mediando culpa y negligencia.
Luego de varios incidentes procesales que culminaron con la celebración del juicio en sus méritos, el Tribunal de Instancia emitió sentencia y declaró con lugar la demanda. En su sentencia, Instancia estimó los daños sufridos por los codemandantes en $35,000.00 para Marisel; $10,000.00 para Santa; $5,000.00 para Pedro Cruz; y $10,000.00 a la sociedad legal de gananciales compuesta por Marisel y Pedro. Por considerar que no se aportó prueba a favor de sus hijos, no se le concedió indemnización a éstos. Por otro lado, se estimó que la parte demandada fue temeraria en la tramitación del pleito, y se le impuso la suma de $5,000.00 por concepto de honorarios de abogado.
Inconforme con la sentencia, Kmart presentó el recurso de apelación ante este foro alegando los siguientes errores:

"PRIMER ERROR

Incidió el Honorable Tribunal de Instancia en error manifiesto, clara arbitrariedad, prejuicio, pasión y parcialidad al aquilazar la prueba desfilada al concluir que la demandante Marisel Anaya Vega entendió de buena fe que al pagar los $66.00 en la caja de salida estaba también pagando las sustituciones de las piezas que se habían roto en el área de lay-away; al concluir que la parte demandada contribuyó y/o provocó la supuesta confusión de la demandante al creer que había pagado; al concluir que toda la situación fue causada por falta de diligencia y cuidado de la supervisora de cajeras y al no concluir que la demandada tuvo motivo fundado para detener a la demandante.

SEGUNDO ERROR

Erró el Tribunal de Instancia al determinar que el incidente ocurrió en el estacionamiento, casi llegando al vehículo de la demandante; que ésta fue tomada por un brazo; que le quitaron el carrito donde llevaba sus artículos y que luego de revisar los recibos de compra, los empleados determinaron que todo estaba bien.

*758
TERCER ERROR

Erró el Tribunal de Instancia al determinar que como producto del incidente, la demandante padeció de "depresión mayor severa" y concederle la suma de $35,000.00por daños; al concederle al codemandante Pedro Cruz Rodríguez la suma de $5,000.00 y a la sociedad legal de gananciales compuesta por ambos la suma de $10,000.00; y al conceder a la codemandante Santa Vega Valentín la suma de '$10,000.00.

CUARTO ERROR

Erró el Tribunal de Instancia al determinar que la parte demandada incurrió en temeridad y al imponerle la suma de $5,000.00por concepto de honorarios de abogado."

Con el beneficio de la transcripción de los testimonios vertidos en juicio, procederemos a resumir aquellas porciones pertinentes a los errores señalados en el recurso. En apretada síntesis, Marisel testificó lo siguiente: 

"Fue con su madre y sus dos hijos a Kmart a saldar un Lay-Away, al cual ya había abonado $200.00. Había mucha gente, por lo que estaban atendiendo por números. En lo que la llamaban, tomó un carrito de compras y se fue a mirar la tienda; escogió algunas cosas para comprar ese día. Cuando le tocó su tumo, la codemandante le dio el número y recibo de Lay-Away a la empleada de Kmart; ésta le buscó la mercancía. La empleada iba echando en un carrito la mercancía, y le decía a Marisel: esto es suyo, un set de sábanas, e iba tachando el artículo de la lista. Entre los artículos separados en Lay-Away, se rompieron dos lámparas, y la empleada le buscó dos nuevas para sustituirlas. 
 Luego de pagar en la caja de Lay-Away $112.91, la codemandante se dirigió a las cajas principales a pagar la mercancía que había escogido ese día en el otro carrito; el total fue $66.00. La Supervisora de Caja firmó el recibo de Lay-Away como que estaba todo bien."

Salió de la tienda con un carrito y un niño al lado. Su madre cogió el carrito de Lay-Away y al otro niño. Marisel continuó su testimonio:
"Salíamos afuera... voy saliendo, cuando estoy llegando al parking, a mi carro, escucho una voz de una mujer que. dice: señora, entonces yo miré y seguí, pero que la señora volvió: señora, y ahí volví yo y miré y ella acercándose más a mí. Entonces me paró y le digo: soy yo, y ella me dice: sí, usted señora. Me paré, entonces ahí vino ella con otro señor, y el señor me quitó el carrito (y el de su mamá), ella me cogió por el brazo y me dice: señora, usted no ha pagado la mercancía. (La codemandante fue llevada al área de Lay-Away, y llamaron al gerente.) El verificó los recibos y la miró a ella y le dijo: esto está bien, esto te lo voy a dar por escrito; el empleado le devolvió los dos carritos. Pues, ahí entonces yo fui donde mi mamá, donde ella se había quedado con mis dos niños. Y entonces yo, cuando llegué, me abracé a ella y empezamos a llorar como cinco o diez minutos. Luego, nos montamos en el carro y no pude irme tampoco rápido, estuve dentro del carro llorando. Los nenes también estaban llorando."
Marisel añadió que luego de este incidente, visitó aproximadamente 20 veces al siquiatra Carlos Vargas Villanueva; de 7 a 8 en 1995, de 6 a 7 en el 1996 y de 4 a 5 en el 1998. Su sintomatología consistió en estar muy triste, angustiada, desanimada, problemas para dormirse, pesadillas. Se sentía que no valía como ser humano, momentos de llanto y miedo. Tuvo problemas con el apetito; sentía que la estaban velando. Que oía que la llamaban; que una catástrofe había pasado en su vida. Se tenía que ir más temprano de su trabajo por sentirse deprimida, y no ejercía sus funciones como debía. Pero prefería ir a trabajar porque sentía que la soledad le hacía más daño. Marisel no quería buscar ayuda siquiátrica; su familia tuvo que forzarla. Aseguró que nunca había visitado a un siquiatra anteriormente.
El Dr. Carlos Vargas Villanueva fue presentado como perito por la parte demandante. Le había diagnosticado a la codemandante depresión mayor severa con sicosis provocada por el incidente ocurrido en Kmart. Cuando el abogado de la parte demandada analizó el récord de la codemandante con el perito, se comprobó que la codemandante había asistido a menos visitas que las que había declarado. En realidad, a 10 *759 visitas en total, y sólo seis fueron con el Dr. Carlos Vargas.
Por su parte, Santa (de 63 años) testifico que, al igual que su hija, ha sufrido angustias mentales y morales. Relató que el día del incidente, cuando los empleados de Kmart se llevaron a su hija del estacionamiento, ella se quedó con sus nietos inmovilizada bajo sol. Los niños le preguntaban, gritando y llorando, porqué se habían levado a su mamá. Santa sintió que su cabeza le iba a estallar; no sabía que hacer. Permaneció sin moverse, bajo sol, alrededor de 35 minutos con sus nietos hasta que su hija salió de la tienda. Alega haber escuchado a los demás clientes decir: "las cogieron robando". Como era época navideña, había mucha gente. Al otro día, visitó a su médico, ya que se sentía muy mal.
Santa admitió que padecía de presión alta con anterioridad al incidente, y que visitaba a su médico periódicamente por dicha condición. No presentó, durante el juicio, prueba médica que acreditara que su condición empeoró a raíz de lo sucedido.
El codemandante y esposo de Marisel, Pedro Cruz, limitó su testimonio a describir cuán alterados llegaron de Kmart sus hijos, su esposa y suegra el día del incidente. Describió los cambios de comportamiento de su esposa desde esa fecha. Ella ya no ayudaba a los niños en las asignaciones, estaba de mal humor, deprimida, no dormía. Fue él quien tomó la iniciativa para que su esposa visitara un psicólogo. También describió cómo su esposa mejoró después del tratamiento. Pero no aportó prueba de que él haya sufrido de manera alguna a causa del incidente de su esposa en Kmart.
La parte demandante también presentó como testigo a la empleada de Lay-Away, Carmen Iris Collazo, para que testificara lo que ya había expresado en la deposición. En la misma, planteó que atendió a la codemandante, que revisó los recibos, le entregó la mercancía y que no hubo tal escándalo. Que ella no la vio proferir ninguna mala palabra, ni nada por el estilo. Pero cuando se sentó a testificar, alegó no recordar el incidente. Al mostrársele un recibo de reembolso de dinero, reconoció su firma. Aún así, no recordaba el incidente.
A preguntas del abogado de la parte demandada, la testigo contestó que cuando a un cliente se le devuelve dinero por un reembolso, el cliente tiene que firmar el recibo. El recibo de "refund" o reembolso que se presentó durante el juicio, no tenía la firma de la codemandante, pero sí aludía a las dos lámparas rotas. Procedió a explicar que, entonces, se le descontó el dinero en el otro recibo" "Okay, el total no sale $112. 91. "Wait a minute" Okay, el Lay-Away era todo de $334.00. Ella dio $200.00 de "downpayment". Le quedaban $134.00. "Then" el "refund" de $21.94. Okay." De esta manera, la empleada justificó la transacción del recibo de $112.91, que fue el último para saldar el Lay Away. También declaró, contrario a lo relatado por la codemandante, que no pudo haber buscado dos lámparas nuevas porque su puesto era en el área de Lay-Away.
Por otro lado, los testigos de la parte demandada relataron su versión de los hechos. Se resume a continuación el testimonio del Sr. José Herrera González, Gerente de Seguridad en la tienda Kmart para la fecha de los hechos. El Sr. Herrera recibió en su oficina una llamada para que pasara urgente por el área de Lay-Away. Al ir, vio a dos personas alteradas, cuando él se acercó, las señoras proliferaban obscenidades y amenazaron con demandar. (Esto es contrario al testimonio de Santa; ella testificó que se quedó en el estacionamiento.) El Sr. Herrera preguntó qué estaba pasando, y la codemandante le relató su experiencia. El le preguntó que quién o quiénes eran los empleados porque le extrañaba que hubiese pasado de esa manera. También añadió que la tienda estaba llena en esos momentos porque se acercaba la época navideña; y que las codemandantes estaban alteradas y nerviosas, y los demás clientes molestos. Continúa el Sr. Herrera diciendo: Como ellas estaban así, [..] pues yo cogí y les dije: "pues no hay problema, llévese las lámparas, si usted dice que son suyas, pues lléveselas, no hay problema".
El Sr. Herrera dijo que temió que sus actuaciones le ocasionaran problemas en su trabajo. Tomó la decisión sin consultar al gerente de la tienda, quien no se encontraba en ese momento. También admitió que tomó dicha decisión con la intención de evitar que los demás clientes se molestaran y no se afectara el desarrollo de la tienda. *760 Pensó, en ese momento, que podría haber problemas con una demanda porque todas las personas que se arrestan en la tienda son llevadas a la Oficina de Seguridad, y se trata confidencialmente. En este caso, la codemandante fue llevada al área de Lay-Away frente a los demás clientes. Aceptó que nunca verificó si las lámparas fueron pagadas o no. Dijo que luego de presentada la demanda, su supervisor le ordenó que redactara un segundo informe sobre los hechos. Surge de su testimonio, que nunca le revisó los recibos de compra a la codemandante, contrario a lo que ésta testificó.
Por su parte, la Supervisora de Cajeras Aleida Pierluissi testificó que parte de su trabajo era verificar los recibos de la mercancía salda (a través del Lay-Away) en el área de las cajas principales. El día de los hechos, recibió una llamada proveniente de la cajera de Lay-Away para que velara a la codemandante porque no había pagado las lámparas sustituidas que estaban en el carrito de Lay-Away. Sin embargo, y contrario a la versión de la codemandante, dicha supervisora testificó que detuvo a la codemandante cerca de la salida dentro de la tienda y no en el estacionamiento. Que nunca tuvo contacto físico, ni la tomó por el brazo para detenerla. Que cuando le pidió el recibo a la codemandante, ésta comenzó a alterarse y le dijo "cosas".
Como perito siquiatra de la parte demandada, declaró el Dr. José Villanueva Arce, quien cuestionó el informe médico presentado por la parte demandante. Se basó en que al examinar a la codemandante, encontró incongruente que ella trabajara, a pesar de sufrir de depresión mayor con psicosis; inclusive, que se fue de viaje. También, la codemandante guardó el luto apropiado cuando su padre falleció, y se recuperó muy bien después de ser operada. Concluyó que el diagnóstico del otro perito es incongruente con el desenvolvimiento de la codemandante. Una persona que estuviera padeciendo del diagnóstico del otro siquiatra, debería estar incapacitado, entre otras cosas, para trabajar. El diagnóstico de este perito, fue "desorden agudo de stress" provocado por el incidente en Kmart.
Analizado ya el expediente y la transcripción, procederemos a resolver.
n
El principio general de responsabilidad civil extracontractual, en el caso de actuaciones de empleados de establecimientos comerciales, establece que el dueño del establecimiento comercial responde civilmente si, mediando culpa o negligencia, alguno de sus empleados le causa daño a un tercero en el ejercicio de sus funciones. Artículo 1802 y 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. sees. 5141 y 5142, respectivamente. Nuestro sistema de responsabilidad civil aspira a la reparación de todo daño causado antijurídicamente. Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1 (1994). Cuando se causa, un daño antijurídico a una persona, el sistema de responsabilidad civil contempla que se resarza el mismo, de manera que se coloque a la víctima del daño en la situación en que se encontraba antes del mismo. La base, fundamental de este postulado lo es el artículo 1802, supra, que dispone lo siguiente:

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."

La causa de acción por culpa o negligencia que emana del citado precepto, se compone en tres elementos: (1) el acto u omisión (negligente o culposo; (2) el daño, y (3) la relación causal, es decir, de causa y efecto, entre el acto u omisión culposo o negligente y el daño sufrido. Irizarry Yunqué, Carlos J., Responsabilidad Civil Extracontractual, Universidad Interamericana de Puerto Rico, 1996, pág. 170. Véase además, Cintrón Adorno v. Gómez,_D.P.R._(1999), 99 J.T.S. 20, opinión de 29 de febrero de 1999.
La culpa o negligencia se define como la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. Ramos v. Carlo, 85 D.P.R. 353, 358 (1962). De igual forma, tampoco es necesario que se haya anticipado la ocurrencia del daño en la forma precisa en que ocurrió; basta con que el daño sea consecuencia *761 natural y probable del acto culposo o negligente. Tormos Arroyo v. Departamento de Instrucción, 140 D.P.R. 265 (1996).
En el caso que nos ocupa, durante el juicio se presentó prueba conflictiva. Es norma general en derecho que los tribunales de instancia están en mejor posición que los foros apelativos para aquilatar la prueba testifical que se aporta en un juicio. El alcance de la revisión judicial sobre cuestiones de hecho está regulado por lo dispuesto en la Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. IH, la cual, en lo pertinente, dispone que:

"...Las determinaciones de hechos basadas en testimonio oral, no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos...".

Por ello, el Tribunal Supremo ha establecido que no debemos "...intervenir con frecuencias con las determinaciones de hechos que hace un tribunal de instancia y a sustituir nuestro criterio por el del juzgador ante quien declararon los testigos y quien tuvo la oportunidad de verlos declarar y apreciar, su demeanor, Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357 (1982), a menos que se demuestre que dicho foro actuó con pasión, prejuicio o parcialidad". Vélez v. Srio. de Justicia, 115 D.P.R. 533, 545 (1984). Así, la apreciación de la prueba efectuada por el Tribunal de Primera Instancia merece gran deferencia, por lo que sólo en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, los tribunales de apelaciones no intervienen en cuanto al trasfondo fáctico determinado en instancia. Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 179, 181 (1985).
La existencia de prueba conflictiva no significa que el Tribunal de Primera Instancia haya cometido un error manifiesto que amerite nuestra intervención en la apreciación de la prueba. A esos efectos, en López Vicil v. ITT Intermedia, 97 J.T.S. 42, pág. 838, se dispuso que:

"La mera existencia de prueba conflictiva no constituye error manifiesto. Por el contrario, reiteradamente hemos resuelto que cuando existe conflicto entre la prueba, corresponde precisamente al juzgador de los hechos dirimir ese conflicto."

En el caso de marras, luego de examinadas las determinaciones de hechos formuladas por el Foro de instancia, éstas encuentran apoyo en la prueba desfilada, según surge de la transcripción del juicio en su fondo. De ésta, no existe indicio que nos demuestre que dicho Tribunal actuó movido por pasión, prejuicio o parcialidad.
Ahora bien, Kmart sí es responsable a la luz de los parámetros esbozados en el mencicnado artículo 1802. Veamos. Conforme a la prueba creída por el Tribunal de Primera Instancia, los empleados de Kmart no siguieron el proceso adecuado para detener el movimiento de mercancía sin pagar fuera de la tienda. Al así actuar, Kmart incurrió en negligencia. De la transcripción surge que la Supervisora de Cajeras tenía conocimiento de que las dos lámparas no se habían pagado; por lo que pudo corregir la situación en ese momento. Su trabajo era, según su propio testimonio, verificar los recibos de la mercancía pagada en Lay-Away en el área de las cajas principales. También la empleada de Lay-Away, quien alegadamente alertó a la Supervisora, debió orientar a la codemandante que tenía que pagar las lámparas en las cajas principales por ser mercancía nueva y no parte del contrato de Lay-Away. Además, cuando la codemandante fue detenida, se debió aclarar la confusión de una vez, verificando los recibos.
Según la codemandante, ella se enteró que nunca pagó las lámparas durante el juicio al requerírsele que comparara los recibos. Las lámparas están descritas en el contrato de Lay-Away de la siguiente manera: Lamp Shade $11.24; Lamp Shade $11.24: Lamp $10.97; Lamp $10.97, La base de la lámpara fue lo que se rompió; lo que curresponde a "Lamp $10.97", artículo que no aparece en el recibo del saldo del Lay-Away por la cantidad de $112.91. Sólo aparece "Lamp Shade" $11.24.
Aun tomando como cierto la prueba testifical de la demandada, tampoco se siguió el procedimiento al detener *762 a la codemandante. Surge del testimonio del Gerente de Seguridad de la tienda que la forma correcta es llevando confidencialmente al cliente a la Oficina de Seguridad. En este caso, no se hizo siquiera una investigación de lo que ocurrió. El proceso de los actos que culminaron en la intervención no fue el más apropiado. No obstante, se reconoce el derecho de todo comerciante, que tenga motivos razonables para creer que una persona le ha hurtado mercancía, a detener a dicha persona en forma razonable y a investigar los hechos también en forma razonable. Brau Del Toro, Herminio M., Daños y Perjuicios Extracontractuales, 2da ed., San Juan, Publicaciones J.T.S, Inc., 1986, página 94.
Kmart tuvo motivos para detener a la codemandante. Lo anterior, porque Marisel no había pagado las lámparas. Así también, Kmart tuvo la oportunidad, mediante varios empleados, de orientar a la codemandante a que tenía que pagar por la mercancía. Aleida Pierluissi debió, en el área de las cajas principales, examinar el recibo de Lay-Away y estampar su firma. Lo anterior era el procedimiento establecido por Kmart. Esta era la oportunidad para señalarle a Marisel que no había pagado por las lámparas. Kmar tiene el derecho de intervenir con los clientes que no han pagado la mercancía de la tienda. Puede esperar que salga de los predios de la misma o lo puede hacer en el área de las cajas o fuera de ellas. Hay muchas maneras para hacerlo sin que éstas lleven el innuendo o la imputación de que se pretendía apropiarse ilegalmente de la mercancía.
Por lo tanto, el procedimiento para la detención seguido por Kmart, a través de sus empleados, fue irrazonable. A consecuencia de esto, los codemandantes sufrieron un daño. El daño fue causado por la negligencia de los empleados de Kmart.
El deber de indemnizar requiere, necesariamente, la existencia de un nexo causal entre el daño y el acto u omisión culposo o negligente. Ortiz Torres v. K & A Developers, Inc., 136 D.P.R. 192 (1994); Estremera v. Inmobiliaria Rac, Inc., 109 D.P.R. 852 (1980). En materia de relación causal, nos regimos por la teoría de la causalidad adecuada, conforme la cual no es causa toda condición sin la cual no se hubiese producido el resultado, sino aquélla que ordinariamente lo produce, según la experiencia general. Jiménez v. Pelegrina, 112 D.P.R. 700 (1982).
Luego de hacer la determinación de que efectivamente se sufrió un daño, procede hacer la clasificación correspondiente de los daños y apreciar el valor de los mismos. La cuantía a ser concedida por los daños sufridos descansa en la sana discreción del juzgador. El derecho a ser compensado no puede derrotarse meramente por el carácter especulativo, que en alguna medida suponed cómputo de daños. Al medirlos, el juzgador debe hacerlo a base de la prueba, procurando siempre que la indemnización no se convierta en una industria y se mantenga su sentido remediador, no punitivo. Rivera Rodríguez v. Tiendas Pitusa, Inc.,_D.P.R._(1999), 99 J.T.S. 107, opinión de 28 de junio de 1999. Si algunos están conscientes, y saben que dicha labor es angustiosa y difícil, son los jueces de instancia, los cuales se ven en la obligación de realizarla día tras día. Resulta poco menos que imposible la elaboración de unas normas o guías enteramente objetivas que sirvan de base para la evaluación de los daños. La ausencia de dichas normas o guías posiblemente sea la razón principal para que haya tan distintas y variadas adjudicaciones a esos efectos por parte de nuestros tribunales de instancia e inclusive por este mismo Tribunal. Cada caso dependerá de sus propias circunstancias. Meléndez v. Metro Taxicabs, 68 D.P.R. 766 (1948).
De otra parte, en nuestro sistema de responsabilidad extracontractual, la indemnización del daño tiene como fin restablecer al démandante al estado en que se encontraba antes de ocurrirle el daño; esto es, devolver las cosas a su estado natural. Correa v. A.F.F., 83 D.P.R. 144 (1961). Esta reparación se denomina reparación in natura o restitutio in integrum. Sin embargo, esto resulta difícil, y muchas veces imposible. Por tanto, en muchas ocasiones se recurre a la alternativa de reparar el daño mediante la concesión de una suma de dinero que se establece como "equivalente" a la pérdida sufrida. Vease, Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985); Galib Frangie v. El Vocero de Puerto Rico, 138 D.P.R. 560 (1995).
La valoración del daño constituye elemento fundamental en nuestro ordenamiento jurídico. Conceder cuantías insuficientes por concepto de daños sufridos tiene el efecto de aminorar la responsabilidad civil a la que deben estar sujetas las actuaciones antijurídicas. Antonio J. Amadeo Murga, El Valor de los Daños en la *763 Responsabilidad Civil, Tomo 1, 1997, pág. 31. Por el contrario, una valoración exagerada daría lugar al elemento punitivo, ajeno a nuestro sistema de derecho. Id.
Para que el sistema civil cumpla con sus propósitos, los tribunales deben propiciar que se logre la más razonable proporción entre el daño causado y la indemnización concedida. Id. Sin embargo, reconocemos que la función de valorar el daño es sumamente difícil, particularmente cuando se trata de valorar daños no patrimoniales o daños morales. Blas Toledo v. Hospital de la Guadalupe,_D.P.R._(1998); 98 J.T.S. 101, opinión de 30 de junio de 1998. La preocupación por la dificultad y complejidad de valorar los daños ha sido manifestada por el Tribunal Supremo en reiteradas ocasiones. Así, en Riley v. Rodríguez de Pacheco, 119 D.P.R. 762 (1987), se indicó:

"La determinación de una compensación justa y razonable por los daños sufridos [es] tarea que constituirá un reto aun para un Salomón del siglo XX. [Cita omitida.) La apreciación humana valorativa de elementos que no son ostensibles y visibles, sino intangibles ...no está exenta de cierto grado de especulación. Aspiramos a que toda adjudicación sea razonablemente balanceada, esto es, ni extremadamente baja como tampoco desproporcionalmente alta."

La gestión judicial de estimación y valoración de daños es sumamente complicada y angustiosa porque "no existe una tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valoración del dolor físico y mental humano, que permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado". Urrutia v. A.A.A., 103 D.P.R. 643 (1975). La tarea de valorar el daño descansa inicialmente en el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana. Urrutia, supra.
A la luz de nuestras anteriores expresiones, procede, pues, disponer en estos momentos del tercer error señalado por los apelantes. En su escrito éstos objetan la estimación que hiciera el Tribunal de Primera Instancia de los daños sufridos por la parte apelada.
Con este trasfondo doctrinal, examinemos si las cuantías concedidas por el Tribunal de Primera Instancia son razonables y adecuadas, y si encuentran apoyo en la prueba desfilada ante el foro a quo. Por lo tanto, se discutirá por partidas el tercer señalamiento de error.
(A) Determinar que la codemandante Marisel Anaya Vega padeció de "depresión mayor severa" por lo que se le concedió la suma de $35,000.00.
Esta partida se modifica a $10,000.00. Examinado el expediente y la transcripción del juicio en su fondo, encontramos que las opiniones de ambos peritos no son compatibles en el diagnóstico. No empece, éstos estuvieron de acuerdo en que el incidente en Kmart fue la causa de lo que ambos le diagnosticaron. No obstante, fue el perito de la parte demandada quien apoyó su opinión en hechos incontrovertidos por la codemandante. Recuérdese que la detención de Marisel fue legal y permitida, pero el procedimiento seguido no fue razonable. A ella se compensa sólo por los daños probados a consecuencia de la irrazonabilidad en el procedimiento de detención y no por la detención misma.
De otro modo, el tribunal apelativo está en libertad de adoptar su propio criterio al evaluar prueba pericial y prueba documental. Segarra Hernández v. Royal Bank de Puerto Rico,_D.P.R._, 98 J.T.S. 37, opinión de 1 de abril de 1998; Díaz García v. Aponte, 125 D.P.R. 1, 13 (1989). En cuanto a la evaluación de prueba pericial, debemos señalar que el juzgador de los hechos no está obligado a aceptar las conclusiones que hayan sido vertidas por un perito. Pueblo v. Vega Montes, 118 D.P.R. 164 (1986); Pueblo v. Marcano Pérez, 116 D.P.R. 917 (1986). Incluso, se puede hasta descartar la prueba pericial, aunque la misma resulte técnicamente correcta. Valdejulli Rodríguez v. A.A.A., 99 D.P.R. 917 (1971); Prieto v. Maryland Casualty Co., 98 D.P.R. 594 (1970); Concepción Guzmán v. A.F.F., 92, D.P.R. 488 (1965). Habida cuenta de que estamos en igual posición que el Tribunal de Primera Instancia para evaluar la prueba pericial, adoptamos el informe del perito de la parte demandada.
*764 El Dr. José Villanueva Arce aseguró que después de depresión bipolar o esquizofrenia, el diagnóstico más severo sería depresión mayor con psicosis. Esta condición alcanza niveles de severidad tal que el paciente no podría trabajar, ni continuar con sus actividades regulares. La codemandante, luego del incidente en Kmart, siempre trabajó, realizó adecuadamente las tareas asignadas, se fue de viaje, llevaba sus hijos a la escuela, y tenía buenas relaciones con sus compañeros de trabajo, entre otras actividades cotidianas.
La información vertida en el récord de visitas de la codemandante no concordó con una persona sicótica. Tampoco, el tratamiento médico descrito en el mismo, ni las experiencias relatadas por Marisel.
(B) Conceder al codemandante Pedro Cruz Rodríguez la suma de $5,000.00
El tribunal apelado incidió al conceder dicha partida. Queda eliminada por no encontrar apoyo en la prueba desfilada. Adoptamos de la sentencia apelada la determinación, de hechos trece que lee de la siguiente manera:
"13. El co-demandante y esposo de la codemandante Anaya Vega, Pedro Cruz Rodríguez, aun cuando prestó testimonio en el caso, del mismo no surgió prueba que éste también se afectara por lo sucedido a su esposa que no fuera el relatar cuán afectada había quedado su esposa luego del incidente. Tampoco, la prueba demostró cuán afectados estuvieron sus hijos menores y también co-demandantes a través de sus padres.”
(C) A la sociedad legal de gananciales compuesta por ambos, la suma de $10,000.00.
Esta partida se elimina. La prueba presentada nunca demostró daños ocasionados a dicha sociedad por el incidente de la codemandante en Kmart. Inclusive, según el testimonio de la propia codemandante, ella siempre continuó trabajando.
(D) Conceder a la codemandante Santa Vega Valentín, la suma de $10,000.00.
Queda modificada la partida asignada a $5,000.00 por considerarla excesiva en comparación a los daños sufridos, según la prueba desfilada.
La totalidad de las circunstancias en el caso de marras y el balance más racional, jurídico y justiciero, nos hace llegar a la conclusión de que procede modificar la. sentencia. Entendemos que dicha determinación se ajusta más a la realidad y circunstancias del caso.
Con relación al cuarto error, mediante el cual, el apelante aduce no haber incurrido en temeridad, le asiste la razón. En cuanto al aspecto de honorarios de abogado, nuestra tradición jurídica se basa en la determinación de temeridad y ello ha descansado siempre en la sana discreción del tribunal sentenciador. Ramírez v. Club Cala de Palmas, 123 D.P.R. 339 (1989). Así fue reiteradamente expresado por el Tribunal Supremo al interpretar la disposición del Art. 327 del Código de Enjuiciamiento Civil, 32 L.P.R.A. 1461, que autoriza la imposición de honorarios de abogado. H.U.C.E. de Am. v. V. & E. Engineering Construction Co., 115 D.P.R. 711 (1984).
La Regla 44.1(d) de las de Procedimiento Civil, 32 L.P.R.A. Ap. HI, provee para cuando una parte haya actuado con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado. "El concepto de temeridad no está expresamente definido por esta regla; se trata de una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713 (1987); Miranda v. E.L.A., 197 D.P.R. 700 (1994). En términos generales, se considera temeraria toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias” Id.
En los testimonios vertidos en corte abierta hubo una gama de contradicciones que hacía imperativo que el tribunal de instancia dependiera sustancialmente de elementos subjetivos para la adecuada resolución del pleito. Los apelantes tenían el derecho de presentar prueba y defenderse de las imputaciones de negligencia habidas en *765 su contra. No se trata aquí de un litigio que pudo haberse evitado. Siendo ello así, no encontramos justificación para la imposición de honorarios de abogado a la parte apelante. Se modificará la sentencia apelada a los fines de eliminar la imposición de honorarios de abogado que hiciera el tribunal de instancia.
Por los fundamentos antes expuestos, se modifica la sentencia apelada a los fines de eliminar las partidas asignadas a Pedro Cruz Rodríguez, la de la sociedad legal de gananciales y honorarios de abogado. Así también, se reduce la compensación de Marisel Anaya Vega a $10,000.00 y la de Santa Vega Valentín a $5,000.00. Así modificada, se confirma la sentencia apelada.
Lo acordó y ordena el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 26
1. Página 8 hasta la 155 de la transcripción.
2. Página 84 de la transcripción.
3. Página 29 de la transcripción.
4. Página 363 hasta la 421 de la transcripción.
5. Página 156 hasta la 175 de la transcripción.
6. Página 175 hasta la 195 de la transcripción.
7. NO VINO ESTA NOTA. APARECE SEÑALADA.
8. Página 211 hasta la 273 de la transcripción.
9. Página 223 de la transcripción.
10. Página 267 de la transcripción.
11. Página 273 hasta la 342 de la transcripción.
12. Página 421 hasta la 440 de la transcripción.
13. Páginas 427-429 de la transcripción.